Vincent L. PROMUTO, Alexis Promuto, Louis V. Promuto, Karen A. Promuto, Vaux Promuto Finnimore, Salvatore Promuto, Louis G. Promuto, Shana Promuto, and Sondra P. Lieberman, Plaintiffs,

v.

WASTE MANAGEMENT, INC., a Delaware Corporation, and Waste Management, Inc., an Illinois Corporation, Defendants.

No. 98 Civ. 3552(WCC).

United States District Court, S.D. New York.

April 23, 1999.

Eisenberg Tanchum & Levy, New York City (Stewart L. Levy, James E. Doherty, of counsel), Lyman & Ash, Philadelphia, Pennsylvania (Cletus P. Lyman, of counsel), for plaintiffs.

Skadden, Arps, Slate, Meagher & Flom LLP, New York City (William P. Frank, Jeremy A. Berman, of counsel), Skadden, Arps, Slate, Meagher & Flom LLP, Chicago, IL (Timothy A. Nelsen, Donna L. McDevitt, Matthew R. Kipp, Lily R. Nazerian, of counsel), for defendants.

### OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

This diversity action is presently before the Court on defendants' motion to transfer the action to the United States District Court for the Northern District of Illinois, pursuant to 28 U.S.C. § 1404(a). Plaintiffs oppose the motion to transfer and have filed a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking partial summary judgment as to defendants' liability for breach of warranty. For the reasons discussed below, defendants' motion is denied and plaintiffs' motion is granted.

### BACKGROUND

I. *The Promuto Action*

The following facts are undisputed unless otherwise stated. This is an action by nine members of the Promuto family [1] for

---

1. Vincent L. Promuto, Alexis Promuto and Louis V. Promuto are residents of the State of

breach of warranty in connection with the sale of their family business, a waste transfer station in the Bronx (the "Transfer Station"). There were five family owned business entities involved with the ownership, operation and management of the Transfer Station: (1) SPM Environmental, Inc. ("SPM"), a New York corporation owned by Salvatore Promuto, his children (Louis G. Promuto, Shana Promuto and Sondra Promuto Lieberman), his brother Vincent L. Promuto and Vincent's children (Louis V. Promuto, Karen A. Promuto and Vaux Finnimore Promuto); (2) Provech Realty Company, Inc. ("Provech"), a New York corporation owned by Salvatore Promuto and his brother Vincent L. Promuto; (3) VAP, Inc. ("VAP"), a Connecticut corporation owned by Vincent L. Promuto and his wife Alexis Promuto; (4) VinSal GP Corp. ("VinSal"), a New York corporation owned by Vincent L. Promuto and his brother Salvatore Promuto; and (5) SalVin, LLC ("SalVin"), a New York limited liability corporation formed by members SPM, Provech and VAP.[2]

Defendant Waste Management, Inc., a Delaware corporation previously known as WMX Technologies, Inc. ("WMX") provides waste management services throughout the United States. Defendant Waste Management, Inc., an Illinois corporation ("WMI"), is a wholly-owned subsidiary of WMX. At all relevant times, WMX and WMI had a principal place of business at Oak Brook, Illinois.[3]

In 1994, Mickey Flood ("Flood"), an officer of WMX contacted the Promutos to discuss WMX's interest in their family business. (Vincent Decl. I ¶¶ 13, 20).[4] On February 24, 1995, as a result of negotiations with William P. Hulligan ("Hulligan"), then Executive Vice President of WMX, SalVin and VinSal entered into an Agreement of Limited Partnership (the "Limited Partnership Agreement") with Waste Management of New York City, Inc. ("WMNY") and Waste Management of NYC, Inc. ("WMNYC"), thereby creating Waste Management of New York City, L.P., a Delaware Limited Partnership (the "Limited Partnership"). (Hulligan Decl. I ¶ 3).

WMNY and WMNYC are wholly-owned indirect subsidiaries of WMI. (Hulligan Decl. I ¶ 4, Ex. 1, § 2.1). SalVin and VinSal were limited purpose business entities formed for the sole purpose of holding interests in the Limited Partnership.[5] The Limited Partnership Agreement was executed by plaintiff Vincent L. Promuto on behalf of VinSal and SalVin, and by William A. Rodgers, Jr. ("Rodgers") on behalf of WMNY and WMNYC.[6]

The Limited Partnership gave WMNY and WMNYC an approximate 51% owner-

---

Connecticut. Karen A. Promuto is a resident of the State of Colorado. Vaux Finnimore Promuto is a resident of the State of Rhode Island. Salvatore Promuto, Louis G. Promuto, Shana Promuto and Sondra P. Lieberman are residents of the State of New York.

**2.** For a breakdown of ownership percentages with respect to each of the five businesses see Declaration of William P. Hulligan in Opposition to Motion for Summary Judgment dated October 9, 1998 ("Hulligan Decl. I") at Exhibit 3.

**3.** On July 16, 1998, WMX merged with and into a wholly-owed subsidiary of USA Waste Services, Inc. WMX is now Waste Management Holdings, Inc., with a principal place of business in Houston, Texas and a regional office in Chicago, Illinois. USA Waste Ser-

vices, Inc. subsequently changed its name to Waste Management, Inc. See Declaration of Vincent L. Promuto in Opposition to Defendants' Motion to Transfer dated October 13, 1998 ("Vincent Decl. I") at ¶¶ 3–5 and Affidavit of Brian J. Clarke in Support of Defendants' Motion to Transfer dated September 22, 1998 ("Clarke Aff.") at ¶ 1.

**4.** Flood is no longer an officer of WMX. He is currently operating his own business in Fort Worth, Texas. (Id. at ¶ 13).

**5.** See id.

**6.** Plaintiffs believe, and defendants do not dispute, that Rodgers is no longer affiliated with WMX or any related company and now resides in Atlanta, Georgia.

ship interest in the Transfer Station.[7] After only one year, WMX decided to' buy-out the Promutos' interest in the Transfer Station for $28 million.[8]

On April 12, 1996, the parties entered into a Plan of Reorganization and Agreement for the Exchange of Stock of WMX Technologies for Substantially All of the Assets of SPM, VAP, Provech and VinSal (the "Exchange Agreement").[9] Pursuant to the Exchange Agreement, the Sellers and Owners agreed to sell to WMI: (1) their entire membership interest in SalVin, including SalVin's limited partnership interest in the Limited Partnership, and (2) VinSal's general partnership interest in the Limited Partnership, in exchange for common stock of WMX. (Hulligan Decl. I ¶ 12). The deal was structured as a tax-exempt exchange of assets for common stock intended to comply with the provisions of Section 368(a)(1)(C) of the Internal Revenue Code of 1986, as amended ("I.R.C." or the "Code"). (Hulligan Decl. I ¶ 13, Ex. 2).

Consistent with the terms of the Exchange Agreement, WMX transferred 863,531 shares of its common stock to Sellers. The number of shares was determined, as set forth in the Exchange Agreement, by dividing the purchase price of $28 million by the average closing price of WMX common stock on the New York Stock Exchange during the period of six to ten days before closing (the first week of April, 1996), or $32.425. (Hulligan Decl. I ¶ 15).

Prior to agreeing to accept WMX stock in exchange for the assets, as acknowledged in Section 2.11 of the Exchange Agreement, Sellers and Owners received: (1) a prospectus of WMX dated May 1, 1995 with supplements thereto dated, November 27, 1995, December 13, 1995 and February 7, 1996; (2) an annual report of WMX for the year ended December 31, 1995; (3) a WMX Report on Form 10–K for the year ended December 31, 1995; and (4) a proxy statement of WMX for its May 1996 meeting of stockholders.

Section 3 of the Exchange Agreement contains the **"Representations and Warranties of the Purchaser and WMX"** and states in pertinent part:

In order to cause the Sellers and Owners to enter into this Agreement and to consummate the transaction contemplated hereby, the Purchaser and WMX jointly and severally make the following representations and warranties: . . .

**Section 3.7 Securities Matters**. . . . WMX has been subject to the reporting requirements of Section 13 or 15 of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder (the "1934 Act") and has filed with the SEC all documents required to be filed under the 1933 Act and the 1934 Act since January 1, 1995 (the "WMX SEC Documents"). As of their respective dates, the WMX SEC Documents complied in all material respects with the requirements of the 1933 Act and the 1934 Act, as the case may be, and none of the WMX SEC Documents contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to

---

7. See Reply Declaration of Vincent L. Promuto in Support of Plaintiffs' Motion for Partial Summary Judgment dated October 27, 1998 ("Vincent Decl. II") at ¶¶ 3 and 5.

8. WMX utilized the Redemption Option Formula set forth in the Limited Partnership Agreement to arrive at $20 million as the value of the Promutos' interest in the Limited Partnership, then offered a premium of $8 million in order to accelerate the buy-out provision. See Supplemental Declaration of Wil-

liam P. Hulligan in Opposition to Plaintiffs' Motion for Partial Summary Judgment dated October 29, 1998 ("Hulligan Decl. II") at ¶¶ 4–7.

9. The parties to the agreement are as follows: WMX as the issuer of stock, WMI as "Purchaser" of the assets, Vincent Promuto and Salvatore Promuto as "Owners", and SPM, VAP and Provech as "Sellers". (Hulligan Decl. I ¶ 9, Ex. 2).

make the statements therein, in light of the circumstances under which they were made, not misleading. The prospectus of WMX and the supplements thereto referred to in Section 2.11 do not contain any untrue statement of material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading as of the date hereof. As of their respective dates, the consolidated financial statements of WMX included in the WMX SEC Documents complied as to form in all material respects with then applicable accounting requirements and the published rules and regulation of the SEC with respect thereto, were prepared in accordance with generally accepted accounting principles applied on a consistent basis during the periods involved (except as may be indicated therein or in the notes thereto) and fairly presented the consolidated financial position of WMX and its consolidated subsidiaries as at the dates thereof and the consolidated results of their operations and statements of cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments and to any other adjustments described therein).

Section 10.1 of the Exchange Agreement further provided that "[a]ll of the respective representations and warranties of the parties to this Agreement shall survive the consummation of the transactions contemplated hereby."

With respect to a breach of the Purchaser's warranties, Section 5.3 of the Exchange Agreement provides in pertinent part:

**Indemnification by Purchaser.** (a) Subject to the limitations set forth in this Agreement, from and after the Time of Closing, the Purchaser agrees to defend, indemnify and hold the Sellers and their officers, directors and shareholders (each, a "Seller Indemnitee") harmless from and against all indemnifiable damages of a Seller Indemnitee. For this purpose, "indemnifiable damages" of a Seller Indemnitee means the aggregate of all expenses, losses, costs, deficiencies, liabilities and damages (including attorneys' fees and court costs) incurred or suffered by any Seller or any of its officers, directors, shareholders, agents, employees or affiliates, as a result of or in connection with: (i) any inaccurate representation or warranty made by WMX or the Purchaser in this Agreement, (ii) any default in the performance of any of the covenants or agreements made by WMX or the Purchaser in this Agreement, or (iii) any failure of the Purchaser to pay, discharge or perform any of the Assumed Liabilities.

As with the Limited Partnership Agreement, the Exchange Agreement was negotiated by Flood and Hulligan [10] in New York and executed by Rodgers on behalf of WMX and WMI. Upon closing the transaction, 863,531 shares of WMX common stock were issued to Sellers. As a result of the reorganization, Sellers dissolved and the shares were distributed to plaintiffs. [11]

On February 24, 1998, WMX announced, via press release, a restatement of earnings for 1992 through 1996 and the first three quarters of 1997. (Defendants' Rule 56.1 Stmt. ¶ 20). [12] Robert S. Miller, Act-

---

**10.** Hulligan left his position as Executive Vice President of WMX in 1997. (Hulligan Decl. I ¶ 1). He is currently a consultant residing in Florida. (Vincent Decl. I ¶ 14).

**11.** *See* Affidavit of Salvatore Promuto in Support of Plaintiffs' Motion for Partial Summary Judgment dated September 23, 1998 ("Salvatore Aff.") at ¶ 15. Pursuant to Section 10.4,

the Exchange Agreement expressly inured to the benefit of Sellers' "successors, assigns, heirs and legal representatives", here, the plaintiffs as owners of the Promuto family business entities.

**12.** A copy of the February 24, 1998 Press Release is attached as Exhibit 15 in Book I of Exhibits in Support of Plaintiffs' Motion for

ing Chairman and Chief Executive Officer of WMX gave the following reason for the restatement:

> The actions we are announcing today reflect our determination to comprehensively address and definitively resolve the financial reporting issues affecting our Company and its credibility with investors. The steps we are taking are the strong prescription we believe is needed to acknowledge past mistakes, clarify our financial reporting picture, and begin the process of restoring investor confidence in Waste Management and its ability to prosper in the future.[13]

With respect to restated earnings, the press release explains:

> During the comprehensive financial review, management and the Audit Committee determined that certain items of expense were incorrectly reported. These principally relate to the calculation of vehicle, equipment and container depreciation expense and capitalized interest. In the depreciation area, the Company employed incorrect vehicle and container salvage value assumptions, and made mistakes in the corporate financial reporting process.
>
> The matters reflected in prior-period restatements include earlier recognition of asset value impairments (primarily related to land, landfill and recycling investments) and environmental liabilities (primarily remediation and landfill closure and postclosure expense accruals).
>
> The Company also concluded that capitalized interest relating to landfill construction projects was misstated. On

January 1, 1995, the Company adopted a more conservative accounting method for calculating capitalized interest. However, the required cumulative accounting "catch-up" charge was not properly reflected in the 1995 financial statements and mistakes were made in applying the new accounting method in subsequent years. Capitalized interest for 1995, 1996, and 1997 has accordingly been restated. . . .

> The Company is accordingly restating its financial results for the years 1992 through 1996. . . . The effect of the restatements is to reduce previously reported net income by a total of . . . $263.8 million in 1995.[14]

On March 30, 1998, WMX filed its Form 10–K with the SEC for the fiscal year ending December 31, 1997, in which it restated net income for 1995 from $603.9 million to $340.1 million. (Defendants' Rule 56.1 Stmt. ¶ 20). On the same day, WMX issued its 1997 Annual Report to stockholders containing the revised Consolidated Financial Statements for years 1992 through 1996 along with explanatory notes regarding the restatements.[15] In his opening letter to shareholders, Robert S. Miller, as Chairman and CEO of WMX reported that:

> Waste Management undertook a thorough review of its business and accounting practices in 1997 . . . . [and] found that certain items had been incorrectly reported, causing us to restate financial results from 1992 through 1996.[16]

The Restated Consolidated Financial Statements disclosed in the 1997 Annual Report reflect marked reductions in net income and stockholders' equity for 1995:

---

Partial Summary Judgment as to Liability ("Book I").

**13.** See Book I, Ex. 15 at p. 204.

**14.** See Book I, Ex. 15 at pp. 206–07.

**15.** A copy of WMX's 1997 Annual Report is attached as Exhibit 17 in Book I.

**16.** Book I, Ex. 17 at p. 222.

| | As Reported in 1996 [17] | As Restated in 1998 [18] |
|---|---|---|
| | (000's omitted except per share amounts) | |
| Net Income | $ 603,899 | $ 340,097 |
| Stockholders' Equity | $ 4,942,339 | $ 4,042,646 |
| Earnings Per Share | $ 1.24 | $ 0.70 |

The notes accompanying the Financial Statements repeat essentially the same explanations set forth in the February 24th Press Release, i.e.,

As a result of a comprehensive review begun in the third quarter of 1997, the Company determined that certain items of expense were incorrectly reported in previously issued financial statements. These principally relate to vehicle, equipment and container depreciation expense, capitalized interest and income taxes. With respect to depreciation, the company determined that incorrect vehicle and container salvage values had been used, and errors had been made in the expense calculations. The Company also concluded that capitalized interest relating to landfill construction projects had been misstated. On January 1, 1995, the Company changed its accounting for capitalized interest ... but the cumulative "catch-up" charge was not properly recorded in the 1995 financial statements, and errors were made in applying the new method in subsequent years. Capitalized interest for 1995 ... has accordingly been restated.[19]

Plaintiffs' counsel immediately notified defendants in writing of the alleged breach of warranty with respect to the financial information provided to Sellers and Owners pursuant to the Exchange Agreement and requested an acknowledgment of liability.[20] The parties failed to reach an amicable resolution of the matter and plaintiffs filed the within diversity action on May 18, 1998. Defendants moved to stay this action pending resolution of a consolidated class action in the Northern District of Illinois on behalf of open market purchasers of WMX stock or, alternatively, to transfer the action to the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a). Plaintiffs opposed the motion and moved for partial summary judgment with respect to defendants' liability for breach of warranty.

## II. *Illinois Class Action*

Numerous class actions brought in the Northern District of Illinois in connection with the financial restatements were consolidated into one action captioned *In re Waste Management, Inc. Securities Litigation,* No. 97 C 7709 (N.D.Ill.). The plaintiffs in the consolidated class action allege, in connection with the restatement of prior period earnings for the years 1992 through 1996 and the first three quarters of 1997, that WMX and certain of its officers and directors knowingly or recklessly issued financial statements that failed to conform to Generally Accepted Accounting Principles ("GAAP"), in violation of Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5.

On December 8, 1998, the parties to the consolidated class action informed the presiding District Court Judge, the Honorable Wayne Anderson, that they had reached

17. WMX's Form 10–K filed with the SEC for the year ended December 31, 1995 is attached as Exhibit 3 in Book I. *See* pp. 82–84.

18. *See* Book I, Ex. 17 at p. 224.

19. Book I, Ex. 17 at p. 236.

20. *See* letter from Cletus P. Lyman, Esq. dated April 3, 1998, attached as Exhibit 18 in Book I at p. 277.

an agreement in principle to settle the action. The class was defined for settlement purposes to include all shareholders who purchased WMX equity securities in the open market during the period from November 3, 1994 through February 24, 1998. The class specifically excludes persons, such as plaintiffs herein, who sold their companies in exchange for WMX stock. Accordingly, on December 10, 1998, defendants withdrew their motion insofar as it sought a stay of this action, but maintained their request for transfer.

The parties to the consolidated class action have since signed a Memorandum of Understanding, and a Special Master was appointed to supervise discovery with respect to the fairness of the proposed settlement. The Special Master is expected to report his findings as to the fairness of the proposed settlement, by April 30, 1999.

## DISCUSSION

### I. *Defendants' Motion to Transfer*

Defendants argue that this action should be transferred to the Northern District of Illinois pursuant to 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

As a threshold matter, defendants must prove that plaintiffs could initially have brought this action in the proposed transferee forum. *See Hoffman v. Blaski,* 363 U.S. 335, 80 S.Ct. 1084, 4 L.Ed.2d 1254 (1960) (venue must properly lie in the transferee forum and defendants must be subject to in personam jurisdiction).

Here, venue would be proper and defendants would be subject to personal jurisdiction in the Northern District of Illinois because, at the time the action was commenced, both defendants maintained a principal place of business at Oak Brook, Illinois.[21]

■ Once plaintiffs' ability to bring suit in the transferee forum has been established, the Court must consider the following factors in determining whether or not a transfer is warranted: (1) the convenience of the parties; (2) the convenience of material witnesses; (3) the relative means of the parties; (4) the locus of operative events; (5) the relative ease of access to sources of proof; (6) the weight accorded to plaintiff's choice of forum; (7) the availability of process to compel the presence of unwilling witnesses; (8) the forum's familiarity with the governing law; and (9) trial efficacy and the interests of justice based upon the totality of the circumstances. *See Schomann Int'l Corp. v. Northern Wireless, Ltd.,* 35 F.Supp.2d 205, 213 (N.D.N.Y.1999); *Telebrands Corp. v. Wilton Indus., Inc.,* 983 F.Supp. 471, 477 (S.D.N.Y.1997). No single factor is determinative, and the decision of whether or not to transfer the action lies wholly within the broad discretion of the district court. *See Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988).

■ Plaintiffs' choice of forum should be given substantial weight, particularly when plaintiffs reside in the district where the action was brought. *See Schomann Int'l,* 35 F.Supp.2d at 213. Indeed, plaintiffs'

---

**21.** Venue would be proper in the Northern District of Illinois pursuant 28 U.S.C. § 1391, which provides:

(a) A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State....

(c) For purposes of venue under this chapter, a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced ... [and] in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State, and, if there is no such district, the corporation shall be deemed to reside in the district within which it has the most significant contacts.

**638**

choice of forum should not be disturbed unless defendants clearly establish that the balance of the above factors weigh heavily in favor of transfer to the proposed forum. *See id.; see also Toy Biz, Inc. v. Centuri Corp.*, 990 F.Supp. 328, 330 (S.D.N.Y. 1998). Defendants have not met this burden.

## A. *Convenience.of the Parties and Witnesses*

The convenience of the parties and the convenience of the witnesses are generally considered the most important factors. *See Telebrands Corp.*, 983 F.Supp. at 477; *Dwyer v. General Motors Corp.*, 853 F.Supp. 690, 692 (S.D.N.Y.1994).

### 1. *Convenience of the Parties*

■ Four of the nine plaintiffs, Salvatore Promuto, Louis G. Promuto, Shana Promuto and Sondra P. Lieberman, reside in Westchester County within the Southern District of New York. Three more plaintiffs, Vincent L. Promuto, Alexis Promuto and Louis V. Promuto reside in Fairfield County, Connecticut, a county adjacent to Westchester. Plaintiff Vaux Finnimore Promuto resides nearby in Rhode Island. The only plaintiff residing outside the immediate area is Karen A. Promuto, a resident of Colorado. While Ms. Promuto would have to travel to either New York or Illinois, this forum is more convenient because she has relatives in New York with whom she may stay during trial.

Residence aside, this forum is also substantially more convenient for plaintiff Shana Promuto because she is partially paralyzed.[22] Shana Promuto requires specially modified accommodations and means of transportation and the assistance of a health care professional. (Shana Decl. ¶ 7). Further, she must attend physical therapy sessions three times per week. (*Id.*). Shana Promuto asserts that she has both a financial and professional interest in

attending all proceedings because she was the recipient of 37,569 shares of WMX stock and is currently attending law school in this district. Defendants argue that "since the interests of all plaintiffs are identical, those interests would be represented adequately by the attendance at trial of Salvatore and Vincent Promuto" and Shana Promuto "does not state that she has any personal knowledge of any relevant facts such that she would be expected to testify as a witness at trial;" therefore, her wish to attend trial is irrelevant. Neither argument is meritorious. All plaintiffs have a legitimate interest in attending the proceedings with respect to their claims, regardless of whether they testify. The proper consideration here is the convenience of parties—a factor separate and distinct from the convenience of witnesses.

Defendant WMI is an Illinois corporation, with a principal place of business in Oak Brook, Illinois and understandably contends that the Northern District of Illinois would be a more convenient forum. Defendant WMX is a Delaware corporation with a current principal place of business in Houston, Texas (as a result of the USA Waste Services merger) and a regional office in Chicago. The Northern District of Illinois would thus be more convenient for defendants. However, both defendants have subsidiaries in the Southern District of New York which undoubtedly could provide defendants' representatives with a base of operations during the trial.

Finally, defendants are national corporations infinitely better equipped to absorb the burdens and costs of litigating away from home than the individual plaintiffs. *See Dwyer*, 853 F.Supp. at 693–94. "A transfer should not merely shift the burden of inconvenience from one party to the other." *Id.* at 693. Accordingly, the convenience and relative means of the parties counsel against transfer.

**22.** *See* Declaration of Shana Promuto in Opposition to Defendants' Motion to Transfer

dated October 12, 1998 ("Shana Decl.") at ¶ 6.

## 2. *Convenience of Witnesses*

■ Defendants list numerous prospective witnesses who reside in Illinois, however, "it is not the number of prospective witnesses that determines the appropriateness of a transfer but, rather, the materiality of their anticipated testimony." *Id.* In an action for breach of warranty, the only witnesses whose testimony would be considered material are: (1) those who have personal knowledge of the negotiation, execution and terms of the contract; (2) those who have personal knowledge of the alleged breach of warranty; (3) those with personal knowledge relevant to any asserted defense; and (4) those with personal knowledge or expertise with regard to the damages sustained by plaintiffs.

The key witnesses having personal knowledge with respect to the negotiation and execution of the Exchange Agreement are Salvatore and Vincent L. Promuto on behalf of plaintiffs, who reside in Westchester and Fairfield County, respectively, and Flood, Hulligan and Rodgers on behalf of defendants, who reside in Texas, Florida and Georgia respectively. The Southern District of New York is clearly more convenient for Salvatore and Vincent L. Promuto. Flood, Hulligan and Rodgers would be forced to travel whether or not the action is transferred, and thus, their residences are immaterial to this inquiry.

Defendants contend that all witnesses having personal knowledge with respect to the verity or falsity of WMX's financial statements reside in Illinois, with the exception of WMX's Chief Financial Officer from February 1997 through October 1997, who resides in Philadelphia. Although defendants do not admit that the 1995 financial statements provided to plaintiffs pursuant to the terms of the Exchange Agreement were incorrect, they do admit that "[o]n February 24, 1998,

[WMX] announced a restatement of its prior period earnings" and that "[o]n March 30, 1998, Waste Management filed its form 10–K with the [SEC] for the fiscal year ending December 31, 1997, in which it restated net income for 1995 from $603.9 million to $340.1 million." (Defendants' Rule 56.1 Stmt. ¶ 20). The materiality of defendants' proposed witnesses in this regard is questionable as the statements contained in WMX's February 24, 1998 press release, Form 10–K and March 30, 1998 Annual Report clearly establish the inaccuracy of the 1995 financial documents provided to plaintiffs. Defendants' knowledge of, and excuse for, the misleading financial disclosure is immaterial. *See CBS, Inc. v. Ziff–Davis Publ'g Co.*, 75 N.Y.2d 496, 553 N.E.2d 997, 554 N.Y.S.2d 449 (1990).[23]

The only defense raised by defendants in their opposition to plaintiffs' motion for partial summary judgment is that plaintiffs waived defendants' breach of warranty by executing the contract despite having knowledge of defendants' breach. The only witnesses with personal knowledge of this alleged waiver would be Salvatore Promuto, Vincent Promuto, Flood, Hulligan, Rodgers, or any other officer or employee of WMX who might have told Salvatore or Vincent Promuto, prior to the execution of the Exchange Agreement, that the warranted financial information was incorrect. The WMX employee who defendants suggest may have disclosed such information to plaintiffs is Wesley Besser. Mr. Besser is currently employed in the Brooklyn, New York office of defendants or one of their subsidiaries. (Vincent Decl. II ¶ 9).

■ Finally, plaintiffs' expert with respect to damages resides in New Jersey and defendants' expert is as yet undisclosed. However, all parties acknowledge

---

23. Further, to the extent that such testimony is necessary, defendants' employees and experts will likely testify in defense of the defendants' without the need for compulsory process. *See Schomann Int'l*, 35 F.Supp.2d at 213 ("because many of Defendants' witnesses are employees of [Defendant], it will not be difficult to assure their attendance at trial"). Plaintiffs have also expressed a willingness to depose any such witnesses in Illinois.

that the convenience of expert witnesses is entitled to little weight, if any. *See McCrystal v. Barnwell County, S.C.,* 422 F.Supp. 219, 224 (S.D.N.Y.1976). Accordingly, this factor does not support a transfer of the action, as it too would simply result in a shifting of the burden from one party to the other. *Dwyer,* 853 F.Supp. at 693.

### B. *Locus of Operative Events and Access to Sources of Proof*

■■ To determine where the operative events took place, the Court should consider plaintiffs' theory of liability as well as any defenses defendants may have. *See* 17 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 111.13[1][d][ii] (3d ed.1997). This action concerns a contract negotiated in New York in connection with the sale of plaintiffs' interest in the family owned Transfer Station in New York. The warranties at issue involve financial documents provided to plaintiffs in New York. Breach of the warranties was established by the restatement of earnings and by defendants' express admission that the original statements were erroneous. Defendants argue that all relevant documents with respect to the preparation and dissemination of the 1995 financial documents and 1998 restatements are located in Illinois. However, as plaintiffs correctly assert, their breach of warranty claim is largely proven by the Exchange Agreement, two conflicting financial statements (i.e., WMX's 1995 Annual Report Form 10–K filed with the SEC, and WMX's Annual Report to Shareholders dated March 30, 1998), and the admissions made at the time of their issuance, without any need to examine the process of their preparation.[24]

Finally, with respect to defendants' defense of waiver, all documents which would reflect plaintiffs' knowledge of defendants' accounting practices allegedly gained through involvement in the Management Committee of the Limited Partnership were turned over to WMX as a result of the reorganization. (Vincent Decl. II ¶ 8). However, it is unclear whether they are maintained by WMX in Houston, Illinois or New York (in the offices of WMNYC).

It appearing that the operative events occurred equally in New York and Illinois, and given the ease of access to the relevant documentation in either venue, neither of these factors clearly favors a transfer of the action. Contrary to defendants' assertion, there is a substantial connection between this action and the Southern District of New York; thus, plaintiffs' choice of forum should be accorded significant weight. *See Anadigics, Inc. v. Raytheon Co.,* 903 F.Supp. 615, 617 (S.D.N.Y.1995); *Dwyer,* 853 F.Supp. at 694.

### C. *Forum's Familiarity with Governing Law*

■ Section 10.11 of the Exchange Agreement provides: **"Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made to be performed therein." While this factor weighs in favor of plaintiffs, *see Filmline (Cross–Country) Prods. v. United Artists,* 865 F.2d 513, 520 (2d Cir.1989); *Schomann Int'l,* 35 F.Supp.2d at 213, defendants correctly point out that it is not determinative, especially because a breach of warranty action does not involve any "unusually complicated" aspects of New York contract law. *Schuur v. Walt Disney Co.,* No. 98 Civ. 2212(LAP), 1998 WL 190321, at *4 (S.D.N.Y. April 21, 1998).

### D. *Trial Efficiency and Interests of Justice*

■■■ In determining whether to transfer an action, courts should consider in which venue the action would proceed more expeditiously. *See Dwyer,* 853 F.Supp. at 694–95. Defendants initially requested transfer of this action so that it may be consolidated with the Illinois class

---

**24.** Copies of which are found in Book I, as Exhibits 4, 3 and 17, respectively.

action. Upon notification that the parties to the class action had reached a settlement, however, defendants modified their request for transfer, arguing instead that the Honorable Wayne R. Andersen is familiar with the facts of the case and will able to simultaneously oversee discovery of this case and that necessary to determine the fairness of the proposed class action settlement. This argument is unpersuasive. The Special Master appointed by the Northern District of Illinois to oversee discovery with respect to the fairness of the proposed settlement has advised that court that discovery is expected to conclude by the end of April, 1999 at which time he will render an opinion as to the fairness of the proposed settlement.

Further, this action differs in several significant respects from the consolidated class action pending in Illinois: (1) plaintiffs herein are specifically excluded from the class of plaintiffs in the Illinois action; (2) this is a simple breach of warranty action, not a complex securities action; and (3) damages to be proven here require proof of specific closing stock prices over a period of five days, not average stock prices over a period of five years. Defendants claim that they have sought to have a similar action (i.e., involving an exchange of stock for assets), *Mowbray v. Waste Management Holdings, Inc.*, No. 98 CV 11534(WGY) transferred from the District of Massachusetts to the Northern District of Illinois. However, as of the date of this Opinion, that case remains in the District of Massachusetts, the court having taken defendants' request for transfer under advisement.

It would be in the interest of judicial efficiency to deny transfer of this action. As a result of the simultaneous motion to transfer and motion for partial summary judgment, this Court has familiarized itself with substantially all of the facts and legal issues surrounding this case. "To require another judge in the Northern District of Illinois to familiarize himself with these issues would be a waste of judicial re-sources." *Telebrands Corp.*, 983 F.Supp. at 478.

■ Finally, it is clear that New York has the greater interest in adjudicating a breach of warranty action where a foreign corporation sends representatives to New York in order to acquire a New York family-owned business. "New York residents have a greater interest in seeing their fellow residents compensated for their losses." *Dwyer*, 853 F.Supp. at 695.

E. *Conclusion Drawn from Evaluating Factors*

For the reasons set forth above, the Court finds that defendants have not met their burden of demonstrating that the relevant factors favor transfer of this action to Illinois, much less that plaintiffs' chosen venue "is completely and utterly outweighed by the severe inconvenience of [defendants]." *Schomann Int'l*, 35 F.Supp.2d at 213. Accordingly, defendants' motion to transfer is denied.

II. *Plaintiffs' Motion for Partial Summary Judgment*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, plaintiffs move this Court for an order granting partial summary judgment as to liability. Specifically, plaintiffs request that the judgment provide that defendants are liable to indemnify plaintiffs for: (i) the deficiency in shares of WMX stock, as of April 12, 1996, as a result of or in connection with the inaccurate representations and warranties contained in the Exchange Agreement; and (ii) all expenses, losses (including past dividends), and costs (including attorney's fees and court costs), incurred by plaintiffs.

A. *Legal Standard*

Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-moving party. *See Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. Partial summary judgment may be granted on the issue of liability alone if there exists a genuine issue as to the amount of damages. Fed.R.Civ.P. 56(c).

While a party seeking summary judgment carries the burden of demonstrating the absence of any genuine issue of material fact, *see Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party must enumerate "specific facts and circumstances supported by depositions, affidavits based on personal knowledge, and admissions" that create a rational inference in his favor and may not rely on conclusory allegations or denials. *General Elec., Co. v. New York State Dep't of Labor,* 936 F.2d 1448, 1452 (2d Cir. 1991).

In considering plaintiffs' motion for summary judgment, the Court must view all facts and construe all rational inferences derived therefrom in the light most favorable to defendants. *See Liberty Lobby,* 477 U.S. at 247–48, 106 S.Ct. 2505; *Pauling v. Secretary of Dep't of Interior,* 160 F.3d 133, 136 (2d Cir.1998).

### B. *Merits of Plaintiffs' Breach of Warranty Claim*

■ Under New York common law, upon showing that: (1) plaintiff and defendant entered into a contract; (2) containing an express warranty by the defendant

with respect to a material fact; (3) which warranty was part of the basis of the bargain; and (4) the express warranty was breached by defendant, plaintiff is entitled to be indemnified for any damages incurred as a result of such breach. *See CBS,* 75 N.Y.2d at 501–06, 554 N.Y.S.2d 449, 553 N.E.2d 997; *Ainger v. Michigan Gen. Corp.,* 476 F.Supp. 1209 (S.D.N.Y. 1979), *aff'd* 632 F.2d 1025 (2d Cir.1980).

■ Plaintiffs Salvatore Promuto and Vincent L. Promuto (i.e., the Owners) were original parties to the Exchange Agreement. All plaintiffs are the successors-in-interest to the Sellers of the Transfer Station who entered into the Exchange Agreement with defendants. (Plaintiffs' Rule 56.1 Stmt. ¶ 1).[25] Defendants do not dispute the existence or validity of the Exchange Agreement; therefore, the first element of plaintiffs' claim is established.

Plaintiffs' claim that the Exchange Agreement includes "an express warranty of the accuracy of WMX's public financial statements for year ending December 31, 1995, and prior periods." (Plaintiffs' Rule 56.1 Stmt ¶ 2). Defendants' argue that this is a mischaracterization of the express language of the warranty. We will therefore rely solely upon the language of the Exchange Agreement which this Court finds to be clear and unambiguous.

In Section 3.7 of the Exchange Agreement, WMI and WMX jointly and severally make the following representations and warranties: (1) "As of their respective dates, . . . none of the WMX SEC Documents contained any untrue statement of a material fact;" and (2) "As of their respective dates, the consolidated financial statements of WMX included in the WMX SEC Documents . . . fairly presented the consolidated financial position of WMX and its consolidated subsidiaries as at the dates thereof."

---

**25.** Section 10.4 of the Exchange Agreement states that it shall "inure to the benefit of the parties hereto and their respective successors, assigns, heirs and legal representatives." De-

fendants do not contest plaintiffs' status as successors-in-interest. (Defendants' Response to Plaintiffs' Rule 56.1 Stmt).

Sellers and Owners were to receive shares of WMX common stock in payment of the $28 million purchase price pursuant to the Exchange Agreement, the number of shares being dependent upon the average closing price of such shares on the New York Stock Exchange during a specified period. The accuracy of WMX's publicly disclosed financial statements was clearly material in that such financial information has a direct and substantial effect on the price of publicly traded shares of stock.[26]

On February 24, 1998, WMX announced a restatement of prior period earnings for the years ending 1992 through 1996 which, in the words of Robert S. Miller, Acting Chairman and Chief Executive Officer, was necessary "to acknowledge past mistakes [and] clarify [WMX's] financial reporting picture." WMX admitted that: (1) "certain items of expense were incorrectly reported;" (2) WMX had "employed incorrect vehicle and container salvage value assumptions, and made mistakes in the corporate financial reporting process;" (3) "capitalized interest relating to landfill construction projects was misstated;" and (4) "the required cumulative accounting 'catch-up' charge was not properly reflected in the 1995 financial statements." Accordingly, WMX declared that it was "restating its financial results for the years 1992 through 1996," the effect of which was to "reduce previously reported net income by a total of ... $263.8 million in 1995."

Upon filing its Form 10–K for the fiscal year ending December 31, 1997 with the SEC on March 30, 1998, WMX issued its 1997 Annual Report to stockholders containing the revised Consolidated Financial Statements for the years 1992 through 1996. Net Income for 1995 was restated from $603.9 million to $340.1 million, stockholders' equity was restated from $4.9 billion to $4.0 billion, and earnings per share were restated from $1.24 to $0.70. The notes accompanying the revised financial statements mirrored the explanations given in the February 24th press release.

From these documents and defendants' statements therein, it is indisputable that defendants breached the express warranties set forth in the Exchange Agreement. Defendants have thus acknowledged that, as of their respective dates: (1) the WMX SEC Documents *did* contain untrue statements of a material fact; and (2) the consolidated financial statements of WMX included in the WMX SEC Documents *did not* fairly present the consolidated financial position of WMX and its consolidated subsidiaries.

 In their opposition to plaintiffs' motion for summary judgment, defendants' do not challenge the fact that the express warranties were breached. Rather, they argue that a genuine issue of fact exists with respect to plaintiffs' (or, more accurately, Sellers' and Owners') reliance on the warranties.

The dispute as to the nature of the "reliance" element in a claim for breach of warranty, as distinguished from the tort of misrepresentation, was resolved by the New York Court of Appeals in *CBS, Inc. v. Ziff–Davis Publishing Co.*, 75 N.Y.2d 496, 554 N.Y.S.2d 449, 553 N.E.2d 997 (1990). There, the court held that a plaintiff asserting breach of warranty need only show "reliance on the express warranty as being part of the bargain between the parties." *Id.*, 75 N.Y.2d at 503, 554 N.Y.S.2d 449, 553 N.E.2d 997. In determining whether a warranty was "part of the bargain," the court held that "[t]he critical question is not whether the [plaintiffs] believed in the truth of the warranted information, ... but whether [they] believed [they were] purchasing the [defendants'] promise [as to its truth]." *Id.* (internal quotations and citation omitted).

**26.** *See, e.g., Cagan v. Anchor Sav. Bank FSB,* No. CV–88–3024, 1990 WL 73423, at *8 (E.D.N.Y. May 22, 1990) (citing *Sirota v. Soli-* *tron Devices, Inc.,* 673 F.2d 566, 577–78 (2d Cir.1982)).

In so holding, the court adopted Circuit Judge Learned Hand's definition of warranty as:

> 'an assurance by one party to a contract of the existence of a fact upon which the other party may rely. It is intended precisely to relieve the promisee of any duty to ascertain the facts for himself; it amounts to a promise to indemnify the promisee for any loss if the fact warranted proves untrue, for obviously the promisor cannot control what is already in the past.'

*Id.* (quoting *Metro. Coal Co. v. Howard,* 155 F.2d 780, 784 (2d Cir.1946)). Therefore, given that an "express warranty is as much a part of the contract as any other term ... [t]he right to indemnification depends only on establishing that the warranty was breached." *CBS,* 75 N.Y.2d at 503–04, 554 N.Y.S.2d 449, 553 N.E.2d 997. In other words, "[o]nce the express warranty is shown to have been relied on as part of the contract, the right to be indemnified does not depend on proof that the [plaintiffs] thereafter believed [the truth of] the assurances." *Id.* at 503, 554 N.Y.S.2d 449, 553 N.E.2d 997.

 The facts of *CBS* are strikingly similar to those in the instant action. CBS had placed a bid to purchase certain magazine businesses from the defendant, Ziff–Davis Publishing, based upon financial information regarding the profitability of such businesses provided by Ziff–Davis. *Id.* at 498, 554 N.Y.S.2d 449, 553 N.E.2d 997. The parties entered into a purchase agreement containing express representations and warranties of the defendant that the financial statements previously provided to CBS had "been prepared in accordance with [GAAP]" and "present fairly the items set forth." *See id.* at 500, 554 N.Y.S.2d 449, 553 N.E.2d 997. CBS subsequently conducted its own investigation of Ziff–Davis's accounts and records and challenged the accuracy of the financial statements. Ziff–Davis responded by stating that "there [was] no merit to the position taken by CBS" and advised CBS that it was contractually obligated to close the deal. *Id.* at 501–02, 554 N.Y.S.2d 449, 553 N.E.2d 997.

On these facts, the court held that Ziff–Davis should not be absolved from its warranty obligations even though "CBS and its accountants questioned the accuracy of the financial information and ... CBS, when it closed, did so without believing in or relying on the truth of the information." *CBS,* 75 N.Y.2d at 505, 554 N.Y.S.2d 449, 553 N.E.2d 997. In a final point of clarification, the court noted: "[w]e do not hold that no reliance is required, but that the required reliance is established if, as here, the express warranties are bargained-for terms of the [agreement]." *Id.* at 506 n. 5, 554 N.Y.S.2d 449, 553 N.E.2d 997.

Recent cases have explored the limitations of the *CBS* doctrine. In *Galli v. Metz,* 973 F.2d 145 (2d Cir.1992), the parties entered into a stock purchase agreement whereby the buyers agreed to purchase a corporation from the sellers. The buyers sued for breach of the express warranty by sellers that they did not "know or have reason to be aware of any facts which might result in any ... claim ... which might adversely affect the business or condition ... of [the corporation] or its properties." *Id.* at 150. At trial, the seller testified that he had fully disclosed to the buyer, prior to closing, that certain property owned by the corporation was contaminated with "hazardous waste materials which exceeded United States Environmental Protection Agency advisory levels" and that the contamination of the site was common knowledge. *Id.* The district court concluded that, because the contamination was disclosed to the buyers, they were foreclosed from asserting a claim for breach of warranty. *See id.* Relying on *CBS,* the buyers appealed arguing that their knowledge of the breach was irrelevant.

Distinguishing the case before it from *CBS,* where "there was a dispute at the time of closing as to the accuracy of partic-

ular warranties," the Court of Appeals for the Second Circuit held in *Galli* that:

> Where a buyer closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach ... unless the buyer expressly preserves his rights under the warranties.

973 F.2d at 151. The court further held that "whether Metz' knowledge of the [property] contamination vitiates his warranty breach claim depends on the circumstances in which Metz learned of the problem." *Id.* It was not clear from the record whether the trial court had found that the buyer learned of the contamination directly from the seller. Therefore, the case was remanded for clarification with the following instructions: (1) if "the district court meant that sellers told Metz of the problem ... then sellers would have a strong argument that Metz waived the warranties;" (2) but if the district court found only that the contamination was "common knowledge" or "that a third person disclosed the problems to Metz and that Metz purchased the sellers' warranty as insurance against any future claims" then, under *CBS*, Metz would still have a claim for breach of warranty. *Id.*

On remand, the district court found that sellers told the buyers about the contamination prior to closing, and that the buyers waived their breach of warranty claim by consummating the deal notwithstanding such disclosure. *See Johnston v. Metz*, No. 87–CV–973, 1993 WL 481395 (N.D.N.Y. Nov.18, 1993).

The holding in *Galli* was reaffirmed in *Rogath v. Siebenmann*, 129 F.3d 261 (2d Cir.1997). In an action under Uniform Commercial Code § 2–313, the buyer of a painting sued the seller for breaching his express warranty that he had no knowledge of any challenges to the painting's authenticity. *See id.* at 263. The court held that "where the seller discloses up front the inaccuracy of certain of his warranties, it cannot be said that the buyer— absent express preservation of his rights— believed he was purchasing the seller's promise as to the truth of the warranties." *Id.* at 265. Concluding that the source and extent of the buyer's knowledge is the critical factor, the court reasoned that, when a buyer is informed, not by the seller, but by a third party or "common knowledge" that the facts warranted are not true, "it is not unrealistic to assume that the buyer purchased the seller's warranty 'as insurance against any future claims,' and that is why he insisted on the inclusion of the warranties." *Id.*

In *Rogath*, the defendant acknowledged that he was aware of a controversy caused by an art gallery's apprehension with respect to certain "peculiarities" of the painting. 129 F.3d at 265. In his affidavit in opposition to plaintiff's motion for summary judgment, the defendant told the court that he had spoken directly with the plaintiff about the controversy and that the plaintiff had "brushed [it] aside." *Id.* The defendant also provided an affidavit from another gallery curator, Mr. Alley, who affirmed that he had spoken with the plaintiff and had advised him that, although he felt the painting was authentic, two other individuals believed it was not. Plaintiff denied that he was aware of any challenges and stated that, had either individual "hinted to [him] that the Painting was of questioned authenticity, it would have been a 'red flag' for [him], as [he] had no desire to spend some $600,000 dollars to purchase a painting the authenticity of which was in dispute." *Id.* at 266.

The court held that what Mr. Alley had told the plaintiff was irrelevant, but "if the seller, Siebenmann himself, informed Rogath of doubts about the provenance or challenges to the authenticity [then] Rogath will be deemed to have waived any claims for breach of warranty." *Id.* In light of defendant's affidavit, the court concluded that genuine issues of material fact existed with respect to what the defendant

had disclosed to plaintiff and reversed the district court's grant of summary judgment.

Here, defendants argue that, as a result of their involvement with the Limited Partnership, plaintiffs had knowledge of WMX's accounting practices which led to the restatement and, therefore, a genuine issue of material fact exists regarding the extent and source of plaintiffs' knowledge about the truth of the warranty contained in the Exchange Agreement. In support of this argument, defendants submit the declaration of William P. Hulligan, which states as follows:

17. A Management Committee, designed to 'oversee the business operations and general strategy of the [Limited] Partnership' and deemed to be the 'ultimate decision-making authority as to the business and affairs of the [Limited] Partnership,' directed the business of the Limited Partnership.

18. The Limited Partnership kept monthly, quarterly and annual financial records ("Limited Partnership Financial Records"). All of the Limited Partnership Financial Records were prepared by Waste Management's Local Controller, Wesley Besser, with whom the Promutos had near daily contact, at the offices of the Limited Partnership.

19. All Limited Partnership Records were prepared under the direction of plaintiffs Vincent Promuto and Salvatore Promuto, were distributed to plaintiffs Vincent Promuto and Salvatore Promuto, and were kept in the New York offices of the Limited Partnership.

20. Plaintiffs Vincent Promuto and Salvatore Promuto, along with William Rodgers, and John Kehoe, and me, were members of the Management Committee at all times during the existence of the Limited Partnership. As representatives of the Management Committee of the Limited Partnership, Vincent Promuto and Salvatore Promuto were active in and responsible for the day-to-day operations of the Limited Partnership. Further, they were privy to the accounting practices used by, and the financial status of, the Limited Partnership.

21. Under the terms of the Limited Partnership Agreement, the Management Committee, including plaintiffs Vincent Promuto and Salvatore Promuto, were responsible for establishing the '[d]etailed accounting principles and procedures' to be used by the Limited Partnership. Further, unanimous approval of the Management committee, including plaintiffs Vincent Promuto and Salvatore Promuto, was required before the Limited Partnership was able to make 'material changes in accounting policies and procedures.' the Promutos also reviewed the monthly financial statements of the Limited Partnership and supplied financial and accounting information to Waste Management's corporate office for approval. The Promutos were involved in the Limited Partnership's payment of corporate and regional fees to Waste Management for such items as insurance coverage, and therefore, on a near daily basis, had direct contact with some of Waste Management's financial personnel.[27]

In support of plaintiffs' motion for partial summary judgment, Salvatore Promuto affirms that:

Sellers, including myself as one of the owners, bargained for and relied upon our receipt of the warranty from defendants.[28]

No one disclosed to me any inaccuracy in the warranty of defendants at any time before the closing of the [Exchange Agreement] or at any other time in 1996. Specifically, no one disclosed (1) that there were mistakes in the consolidated financial statements of [WMX], (2) that 1995 earnings and those of prior years were overstated; (3) that assets as

---

27. Hulligan Decl. I at ¶¶ 17–21.

28. Salvatore Aff. at ¶ 12.

of December 31, 1995, were overstated; or (4) that expenses were incorrectly reported.

No one has informed me that the Limited Partnership was involved in the restatement of WMX financial statements. No one has informed me that there was any mistake in financial statements of the Limited Partnership, and no representative of our family companies was asked to participate in the review of WMX financial statements begun in late 1997, or in the later restatement.[29]

Plaintiffs' also submit the Reply Declaration of Vincent L. Promuto which states:

2. No one disclosed to me any inaccuracy in the warranty of defendants at any time before the closing of the [Exchange Agreement] or at any other time in 1996. Specifically, no one disclosed (1) that there were mistakes in the consolidated financial statements of [WMX], (2) that 1995 earnings and those of prior years were overstated; (3) that assets as of December 31, 1995, were overstated; or (4) that expenses were incorrectly reported....

4. Wesley Besser was employed by the Limited Partnership before the buyout.

5. The Limited Partnership operated one waste transfer station in the Bronx, where waste was transferred from small trucks to large trucks. Gross receipts for 1995, were under $16 million.

6. The Limited Partnership did not own or operate landfills. The Limited Partnership was not an income tax payer, but it reported its income to the partners and the Internal Revenue Service. The Limited Partnership had no knowledge how the partners computed their income taxes. Our family companies filed their own tax returns, and paid their own income taxes, and so did WMX.

7. No one has informed me that the Limited Partnership was involved in the restatement of WMX financial statements. No one has informed me that there was any mistake in financial statements of the Limited Partnership, and no representative of our family companies was asked to participate in the review of WMX financial statements begun in late 1997, or in the later restatement....

9. Mr. Besser now works for WMX or one of its subsidiaries at its Brooklyn, New York office.[30]

It is therefore clear that, at most, all defendants have accomplished is to raise a question whether plaintiffs were in a position to know of any inaccuracies in the financial statements of the Limited Partnership. But the correctness of those statements is wholly immaterial to the claims asserted by plaintiffs.

### 1. *Financial Information Regarding the Limited Partnership*

The financial statements at issue are those of WMX, not the Limited Partnership. WMX was not a member of the Limited Partnership. Nor was WMX a closely related parent corporation of any partner. The member corporations were WMNY and WMNYC which are wholly-owned indirect subsidiaries of WMI, which in turn is a subsidiary of WMX. (Hulligan Decl. I ¶ 4, Ex. 1, § 2.1).

Plaintiffs' knowledge of the accounting practices and financial status of the Limited Partnership is irrelevant. The Limited Partnership operated one waste transfer station in the Bronx, with gross receipts in 1995 of under $15 million. Even assuming plaintiffs had intimate and complete knowledge of all financial information with respect to the Transfer Station, WMNY and WMNYC, this in no way supports the inference that they had intimate and com-

---

29. *See* Reply Declaration of Salvatore Promuto in Support of Plaintiffs' Motion for Partial Summary Judgment dated October 26, 1998 at ¶¶ 2–3.

30. Vincent Decl. II at ¶¶ 2, 4–7 and 9.

plete knowledge of the financial status and accounting practices of WMX. Further, while it is conceivable that plaintiffs' gained knowledge of accounting methods used in connection with vehicle, equipment and container depreciation expenses from their involvement with the Transfer Station, it does not follow that plaintiffs' were also provided with information from WMX about earlier recognition of asset value impairments, environmental liabilities or methods of capitalizing interest relating solely to WMX's land, landfill and recycling investments—matters at the heart of WMX's restatement of earnings.

### 2. Information Disclosed by Defendants

The law is clear that in order to conclude that plaintiffs have waived their right to assert a claim for breach of warranty, we must find that, prior to closing, defendants themselves actively disclosed to plaintiffs facts which would have constituted a breach of the warranties under the terms of the Exchange Agreement. See Galli, 973 F.2d at 151, Rogath, 129 F.3d at 265; see also LTV Aerospace and Defense Co. v. Thomson–CSF, S.A. (In re Chateaugay Corp.), 155 B.R. 636, 650 (S.D.N.Y. 1993). Defendants' sur-reply memorandum of law merely confirms what was apparent from the declarations they submitted in opposition to plaintiffs' motion—that defendants have failed to enumerate "specific facts and circumstances supported by depositions, affidavits based on personal knowledge, and admissions" that create a rational inference in their favor with respect to plaintiffs' alleged waiver.

In their sur-reply memorandum, defendants contend that after a short period of discovery, the evidence would show that "plaintiffs knew about the particular practices that Waste Management used that later led to much of the restatement" and that such knowledge "could have caused them to disregard the warranty regarding

[WMX's] financial statements." Finally, defendants' acknowledge that they are "not arguing here, as plaintiffs suggest, that [WMX] knew in April 1996 that its financial statements were incorrect. It did not." Therefore, WMX could not possibly have disclosed their inaccuracy to plaintiffs. Rather, WMX's position "is that in light of plaintiffs' extensive business contacts with [WMX], they may have held the view that they could not rely on the warranty[31] and, in fact, did not rely on it."

Defendants have failed to come forward with any facts which could lead a rational juror to find that either defendant advised plaintiffs, prior to closing, that WMX's financial statements were inaccurate. Although defendants name Wesley Besser as the WMX contact who most likely would have provided plaintiffs with financial information about WMX, and although Mr. Besser is currently employed by WMX or one of its subsidiaries here in New York, defendants failed to submit an affidavit from Mr. Besser, or any other WMX employee or representative stating that such information was provided by them. Indeed, Hulligan, who was also a member of the Limited Partnership Management Committee, was unable to attest in any of his submitted declarations that he had disclosed any information to plaintiffs which contradicted defendants' warranties.

Defendants' argument that proof of any such communication between a WMX or WMI employee and plaintiffs is wholly within the knowledge and control of plaintiffs is absurd. Plaintiffs have attested to the fact that no such disclosure was ever made. Defendants certainly have access to any of their own employees who would be able to testify to the contrary. Further, all written communications in connection with the financial operations of the Limited Partnership are in defendants'

---

**31.** Defendants repeatedly imply that the only warranty at issue is the representation that WMX prepared its financial statements in accordance with GAAP. Conspicuously absent from defendants' materials is any discussion of the warranties regarding the accuracy of WMX's publicly disclosed financial information.

possession pursuant to the terms of the Exchange Agreement.

Finally, any information about WMX's accounting policies that plaintiffs' may have gained either through their own efforts, "common knowledge" or third party communications is wholly irrelevant; therefore, any issues of fact in this regard, raised by defendants are immaterial for the purposes of this motion. *See Rogath,* 129 F.3d at 266; *Galli,* 973 F.2d at 151. Defendants argue that, by virtue of their relationship with WMNY and WMNYC, plaintiffs should have become sufficiently knowledgeable of the accounting practices of WMNY's and WMNYC's twice-removed indirect parent corporation that plaintiffs should have realized that WMX's publicly disclosed financial information was inaccurate. This proposition is based upon a fundamental misconception of contractual warranties which are "intended precisely to relieve the promisee of any duty to ascertain the facts for himself." *Metro. Coal Co.,* 155 F.2d at 784. From the terms of the Exchange Agreement and the declarations submitted herein, it is clear that plaintiffs purchased WMX's warranty as insurance against a deficiency in the amount of shares received in exchange for their family business. *See Rogath,* 129 F.3d at 265.[32]

### 3. *Failure to Provide a Rule 56(f) Affidavit*

Lastly, defendants contend that summary judgment is inappropriate at this juncture because defendants have been unable to take the discovery necessary to develop their defense. Under Fed. R.Civ.P. 56(f), summary judgment "may be inappropriate where the party opposing it shows ... that he cannot at the time present facts essential to justify his opposition." Fed.R.Civ.P. 56(e) advisory committee's note (1963). The nonmoving party must have "had the opportunity to discover information that is essential to his opposition" to the motion for summary judgment. *Liberty Lobby,* 477 U.S. at 250 n. 5, 106 S.Ct. 2505.

■ The Court must consider several factors in determining whether to grant summary judgment in the absence of discovery: (1) whether the lack of discovery was in any way due to fault or delay on the part of the nonmovant; (2) whether the nonmovant filed a sufficient Rule 56(f) affidavit explaining: (i) what facts are sought and how they are to be obtained, (ii) how those facts are reasonably expected to create a genuine issue of material fact, (iii) what effort the affiant has made to obtain them, and (iv) why the affiant was unsuccessful in those efforts; and (3) whether the nonmovant provided any basis for its belief that further discovery would alter the outcome of the summary judgment motion. *See Berger v. United States,* 87 F.3d 60, 65 (2d Cir.1996); *Meloff v. New York Life Ins. Co.,* 51 F.3d 372, 375 (2d Cir.1995) (setting forth sufficiency requirements for 56(f) affidavit); *see also Infostar Inc. v. Worcester Ins. Co.,* 924 F.Supp. 25 (S.D.N.Y.1996) (not premature where no 56(f) affidavit and lack of discovery did not impede nonmovant's ability to make its argument).

■ Here, all these factors weigh against defendants' plea for further discovery. As already noted above, proof that defendants disclosed the inaccuracy of WMX's financial statements to plaintiffs is within defendants' control (e.g., through access to WMX employees and Limited Partnership records and correspondence). Further, defendants chose not to file a Rule 56(f) affidavit. Rather, they raised the inadequate discovery argument for the

---

32. Defendants' argument that plaintiffs did not rely on the warranties because the purchase price was extremely generous and therefore plaintiffs were lucky to receive the amount of stock that they did is utterly without merit. Having negotiated a contract whereby the sale price for the family business is $28 million dollars, it is ludicrous to assert that plaintiffs would have been perfectly content to receive shares of stock worth a much lesser amount.

first time in their sur-reply memorandum of law. Finally, the memorandum did not provide this Court with any basis to believe that further discovery would alter the outcome of the summary judgment motion. *See Trebor Sportswear Co. v. The Ltd. Stores, Inc.*, 865 F.2d 506, 511–12 (2d Cir. 1989).

### C. *Plaintiffs' Right to Indemnification*

This Court finds that defendants breached their express warranties and that such warranties were bargained-for terms of the Exchange Agreement. Further, defendants have failed to advance any defense to plaintiffs' breach of warranty claim such as fraud, duress or coercion. Accordingly, there is no genuine issue of material fact with respect to defendants' liability and plaintiffs are entitled to judgment as a matter of law. Defendants are therefore liable to indemnify plaintiffs, under New York common law, for all damages proximately caused by the breach to the extent such damages are proven at trial. *See CBS*, 75 N.Y.2d at 503–06, 554 N.Y.S.2d 449, 553 N.E.2d 997; *Metromedia Co. v. Fugazy*, 983 F.2d 350, 360 (2d Cir.1992). The only remaining issue to be addressed is whether Section 5.3 of the Exchange Agreement obligates defendants to indemnify plaintiffs against "all expenses, losses, costs, deficiencies, liabilities and damages (including attorneys' fees and court costs) incurred or suffered" as a result of such breach.

Under New York law, an agreement by a party to a contract to indemnify the other for attorney's fees incurred in litigation between them must be "unmistakably clear from the language of the promise," *Hooper Assoc., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 492, 548 N.E.2d 903, 905, 549 N.Y.S.2d 365, 367 (1989), or else it must be manifest from the surrounding facts and circumstances · or purpose of the agreement. *See id.* (citing *Breed, Abbott & Morgan v. Hulko*, 139 A.D.2d 71, 531 N.Y.S.2d 240 (1st Dep't 1988), *aff'd*, 74 N.Y.2d 686, 541 N.E.2d 402,

543 N.Y.S.2d 373 (1989)). The Court must read the indemnification provision in conjunction with all other provisions in the agreement to avoid inconsistencies or an interpretation which would render another provision superfluous or without effect. *See Hooper*, 74 N.Y.2d at 492–93, 549 N.Y.S.2d 365, 548 N.E.2d 903.

Section 5.3(a) of the Exchange Agreement provides:

> Subject to the limitations set forth in this Agreement, from and after the Time of Closing, the Purchaser agrees to defend, indemnify and hold the Sellers and their officers, directors and shareholders (each, a "Seller Indemnitee") harmless from and against all indemnifiable damages of a Seller Indemnitee. For this purpose, "indemnifiable damages" of a Seller Indemnitee means the aggregate of all expenses, losses costs, deficiencies, liabilities and damages (including attorneys' fees and court costs) incurred or suffered by any Seller or any of its officers, directors, shareholders, agents, employees or affiliates, as a result of or in connection with: (i) any inaccurate representation or warranty made by WMX or the Purchaser in this Agreement, (ii) any default in the performance of any of the covenants or agreements made by WMX or the Purchaser in this Agreement, or (iii) any failure of the Purchaser to pay, discharge or perform any of the Assumed Liabilities.

Defendants' argue that they agreed to defend and indemnify Sellers only from third party claims and that this provision does not "expressly or impliedly, provide indemnification as to claims between the parties." Read alone, Section 5.3(a) does not make it "unmistakably clear" that the parties intended to indemnify each other for suits between themselves. However, the disingenuous nature of defendants' argument is immediately apparent upon review of the language of Sellers' indemnification provision in Section 4.2(a) which mirrors the precise lan-

guage of Section 5.3(a) quoted above then states:

> The indemnification provided for herein shall be the exclusive remedy against Sellers and Owners for breach of any representation, warranty or covenant in this Agreement. Notwithstanding anything herein to the contrary, (i) neither the Purchaser nor any of its affiliates shall assert any claims for indemnification hereunder or seek to collect any amounts owed for indemnification hereunder from any shareholders of the Sellers other than the Owners, and (ii) the aggregate direct and indirect liability of each of the Owners under this Agreement shall not exceed $7,000,000 for Vincent Promuto and $5,000,000 for Salvatore Promuto ($12,000,000 in the aggregate for both Owners); provided that such limitations shall not apply to any breach of representations and warranties in Section 2.5 and the second sentence of 2.10 or any failure to convey to Purchaser the Purchased Assets; and provided further, that in no event shall the aggregate liability of the Sellers and Owners exceed $28,000,000.

This language plainly reveals the parties' intent that any claims brought by WMI against the Sellers and Owners under Section 4.2 be subject to the recovery limitations set forth above, with the exception of (i) claims by WMI for breach of Sellers' representations that it owned the assets to be transferred (Section 2.5) and that it validly executed the Exchange Agreement (Section 2.10), and (ii) WMI's claim against Sellers' for breach of contract should they fail to convey the assets in accordance with the Exchange Agreement. Defendants cannot argue that although the language of Section 4.2(a) provides for indemnification as to claims between the parties, the exact same language used later in Section 5.3(a) does not.

Contrary to defendants' assertion, the paragraphs immediately following Section 5.3(a) also support this interpretation. In this respect, the indemnification provisions in the Exchange Agreement are distinguishable from those in *Hooper*. In *Hooper*, Article 9(A) of the indemnification agreement at issue obligated the defendant to "indemnify and hold harmless [plaintiff] ... from any and all claims ... and expenses, including reasonable counsel fees" arising out of, *inter alia*, breach of warranty claims. 74 N.Y.2d at 492, 549 N.Y.S.2d 365, 548 N.E.2d 903. Article 9(D) then required plaintiff to "promptly notify" defendant of "any claim or litigation to which the indemnity set forth in Sub–Paragraph 9(A) shall apply" and further provided that defendant could "assume the defense of any such claim or litigation." *Id.* From this language, the court concluded:

> To extend the indemnification clause to require defendant to reimburse plaintiff for attorney's fees in the breach of contract action against defendant would render these provisions meaningless because the requirement of notice and assumption of the defense has no logical application to a suit between the parties. Construing the indemnification clause as pertaining only to third party suits affords a fair meaning to all of the language employed by the parties in the contract and leave no provision without force and effect.

*Id.* at 492–93, 549 N.Y.S.2d 365, 548 N.E.2d 903.

In the instant case, unlike *Hooper*, the notice requirement and assumption of defense provisions are expressly limited to third-party claims as opposed to "any claim to which the indemnity set forth in sub-paragraph (a) applies." Section 5.3(b) provides,

> (b) In the event that any third party asserts a claim against any [Seller Indemnitee] which may result in a claim for indemnification against the Purchaser, then such Seller Indemnitee shall promptly give written notice to the Purchaser of such claim.

The liability asserted in any third-party complaint against a Seller Indemnitee is then defined for purposes of the Exchange

Agreement as "the 'asserted liability of Seller.'" Sub-paragraphs (c) through (e) delineate WMI's right to "assume the defense of, and to settle, any asserted liability of Seller." Therefore, in sharp contrast to the agreement in *Hooper,* Section 5.3 of the Exchange Agreement evinces a clear intent to distinguish between inter-party claims and third-party claims, with the notice and assumption of defense provisions applying exclusively to the later.

Finally, this action is more akin to *Breed, Abbott & Morgan* wherein the plaintiff law firm agreed to act as escrow agent in connection with the purchase of a home by the defendant Hulko from a third party. *See Breed, Abbott & Morgan,* 139 A.D.2d at 72, 531 N.Y.S.2d 240. Despite agreeing to hold Breed, Abbott "harmless from any claims, damages, losses or expenses arising in connection" with "any act or omission except for bad faith or gross negligence," Hulko sued Breed, Abbott for releasing the escrow funds to sellers when Hulko defaulted on the contract of sale. *Id.* Upon dismissal of Hulko's lawsuit, Breed, Abbott sued Hulko for all expenses resulting therefrom, including attorney's fees. In affirming an award of costs and attorney's fees by the Appellate Division, the Court of Appeals held that:

> if this [indemnification] agreement did not include plaintiff law firm's 'legal expenses incurred in defending against an action by one of the parties alleging misconduct by the escrowee which resulted in a determination in favor of the escrowee, it is difficult, if not impossible, to ascertain for what it was that the parties had agreed to indemnify the escrowee.'

74 N.Y.2d at 687, 543 N.Y.S.2d 373, 541 N.E.2d 402 (quoting from 139 A.D.2d at 73, 531 N.Y.S.2d 240).

---

**33.** As noted by plaintiffs, if they were to sell their WMX shares after the required holding period, plaintiffs would have been anonymous sellers in an open market. Buyers of WMX shares would have no access to plaintiffs'

Here, defendants agreed to indemnify Seller's Indemnitees for all expenses, costs and damages incurred as a result of or in connection with "any inaccurate representation or warranty made by WMX or the Purchaser in this Agreement." It is difficult to imagine a third-party action that could be brought against plaintiffs as a result of WMX's issuance of inaccurate financial statements for the year ending December 31, 1995, statements which plaintiffs had no responsibility for preparing.[33] Just the contrary, plaintiffs had no reason to suspect the accuracy of WMX's publicly disclosed financial information and relied heavily upon them because of their impact on the value of the shares of WMX stock plaintiffs were to receive in consideration for their exchange of assets.

Accordingly, defendants' obligation to indemnify plaintiffs for all damages, expenses and costs, including attorney's fees, associated with an action between the parties "can be clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances." *Hooper,* 74 N.Y.2d at 491, 549 N.Y.S.2d 365, 548 N.E.2d 903.

### D. *Form of Relief Sought*

Plaintiffs seek to have defendants' cure the deficiency in consideration received under the Exchange Agreement by issuing additional shares of WMX stock or, in the alternative, by paying monetary damages in an amount which would allow plaintiffs to purchase the requisite shares of WMX stock. The Court hereby reserves decision on the appropriate form of relief pending trial on the issue of damages.

### CONCLUSION

For the reasons discussed above, defendants' motion to transfer is denied and

identities but rather would sue WMX, its officers and accountants, for violations of the securities laws as they have in the Illinois class action and other such actions around the country.

plaintiffs' motion for partial summary judgment as to liability is granted.

SO ORDERED.