**HOMEWARD RESIDENTIAL, INC.,** solely in its capacity as Servicer for the Option One Mortgage Loan Trust 2006–3, for the benefit of the Trustee and the holders of Option One Mortgage Loan Trust 2006–3 Certificates, Plaintiff,

v.

**SAND CANYON CORPORATION,** f/k/a Option One Mortgage Corporation, Defendant.

No. 12 Civ. 7319 (AT).

United States District Court, S.D. New York.

Signed Feb. 14, 2014.

Stephen Roy Blacklocks, Michael Bert Kruse, Brian V. Otero, Hunton & Williams, LLP, New York, NY, for Plaintiff.

James K. Goldfarb, Soren Elliot Packer, Murphy & McGonigle PC, New York, NY,

Jeffrey W. Kilduff, Lauren M. Moore, Robert M. Stern, Jessica L. Thorn, O'Melveny & Myers LLP, Washington, DC, for Defendant.

### MEMORANDUM AND ORDER

ANALISA TORRES, District Judge:

In this diversity action, Plaintiff, Homeward Residential, Inc., sues Defendant, Sand Canyon Corporation, for breach of contract and indemnification. Defendant moves to dismiss the amended complaint (the "complaint") pursuant to Rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons stated below, Defendant's motion is GRANTED in part and DENIED in part.

### BACKGROUND

The following facts are taken from the complaint and accepted as true for the purposes of this motion. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir.2007).

#### I. *Overview*

In 2006, Defendant, a mortgage originator, sold a pool of mortgage loans and in connection with that sale, made more than fifty representations and warranties regarding the loans. Defendant represented, among other things, that the loans complied with its stated underwriting guidelines, that the information Defendant had provided about the loans was true and correct, and that, to Defendant's knowledge, there had been no fraud in the origination of the loans. Am. Compl. ¶¶ 1, 2, ECF No. 33. The complaint alleges that 96 of the loans sold breach Defendant's representations and warranties and that Defendant has failed to cure or repurchase the defective loans. *See id.* at ¶¶ 3, 4.

#### II. *RMBS Securitization*

Residential mortgage-backed securities ("RMBS") are a type of asset-backed security collateralized by residential mortgages. In a RMBS securitization, a mortgage originator, or a sponsor, first assembles a pool of mortgage loans. This pool of loans is then transferred by the originator or sponsor to an affiliated entity called the "depositor."

The depositor then transfers the loans to a mortgage trust. The trust then issues securities—usually referred to as "certificates"—entitling holders to a specified portion of the monthly revenue stream produced by the borrowers' principal and interest payments. The money received from the sale of the certificates flows back to the originator or sponsor as payment for the loans. *Id.* at ¶ 9.

#### III. *The Parties*

Defendant is a California corporation with its principal place of business in Irvine, California. Until 2008, Defendant was known as Option One Mortgage Corporation. *Id.* at ¶ 6. Defendant originated the mortgage loans at issue (or purchased them from a correspondent lender), and transferred the loans to Option One Mortgage Acceptance Corporation (the "Depositor"). This transfer was structured as a sale, and the purchase of the loans is documented in the Mortgage Loan Purchase Agreement (the "Purchase Agreement"). *Id.* at ¶ 10. The Purchase Agreement sets forth the representations and warranties at issue. *See id.* at ¶ 13. The Depositor then conveyed "all right, title and interest" in the mortgage loans to a trust (the "Trust") by means of a Pooling and Servicing Agreement (the "PSA"). *See id.* at ¶ 11. The PSA expressly states that Wells Fargo Bank, N.A. (the "Trustee"), *id.* at ¶ 11, may seek redress for "breach by the Originator of any representation, warranty or covenant under the ... Purchase Agreement." *Id.* at ¶ 20 (internal quotation marks omitted).

Plaintiff is a Delaware corporation with its principal place of business in Coppell, Texas. Plaintiff is the servicer of the Trust. *Id.* at ¶ 5. The PSA gives Plaintiff, as servicer of the Trust, the authority to enforce Defendant's obligations—*including its obligation* " 'to purchase a Mortgage Loan ... on account of missing or defective documentation or on account of a breach of a representation, warranty or covenant'—'for the benefit of the Trustee and the Certificateholders.' " *Id.* at ¶ 21 (citation omitted).

#### IV. *Defendant's Representations and Warranties*

In the Purchase Agreement, Defendant made over fifty representations concerning

the quality of the mortgage loans, including that:

- " '[t]he information set forth on each Schedule [of mortgage loans]'—which identifies the borrower, the mortgaged property's appraised value, and loan-to-value ratios, among other information— 'is true and correct in all material respects';
- '[t]here is no material default, breach, violation or event of acceleration existing under the [related] Mortgage or the related Mortgage Note';
- '[t]o the Originator's knowledge, there was no fraud involved in the origination of the Mortgage Loan by the mortgagee or by the Mortgagor, any appraiser or any other party involved in the origination of the Mortgage Loan';
- the mortgage file 'contains an appraisal of the Mortgaged Property indicating the appraised value at the time of origination for such Mortgaged Property,' and '[e]ach appraisal has been performed in accordance with the provisions of the Financial Institutions Reform, Recovery and Enforcement Act of 1989';
- '[e]ach Mortgage Loan was originated substantially in accordance with the Originator's underwriting criteria, which are at least as stringent as the underwriting criteria set forth in the Prospectus Supplement';
- and '[e]ach Mortgage Loan was originated in compliance with all applicable local, state and federal laws.' "

*Id.* at ¶ 13 (citations omitted). Under the Purchase Agreement, "[a]ny breach by [Defendant] of its representations that materially and adversely affects the value of a loan or materially and adversely affects the interests of the Trust and its Certificateholders in that loan requires [Defendant] to cure the breach within 120 days of discovery or notice of the breach. If [Defendant] cannot cure the breach, it is obliged to repurchase the loan." *Id.* at ¶ 16 (citations omitted).

1. LTV ratios reflect the amount of equity the borrower has in the property when he or she takes out a mortgage. For example, an 80% LTV means that the mortgage equals 80% of the prop-

## V. *Defendant's Alleged Breaches*

In a letter dated March 8, 2012, the Trustee gave Defendant notice of the alleged breaches of Defendant's representations and warranties with respect to certain mortgage loans. The notice enclosed a letter from a certificate holder identifying the loans and describing the nature of the breaches and the grounds for concluding that there had been a breach. The Trustee enclosed a schedule (the "Trustee Schedule") that identified the representations and warranties that were breached for each of the loans and described the defects for each of those loans, along with a disk with nearly 4,500 pages of materials supporting the allegations. *Id.* at ¶ 3. The Trustee's letter and the supporting materials are attached to the complaint as Exhibit A.

Broadly, the breaches described in the letter and the supporting materials (all incorporated by the complaint) include allegations that Defendant, in violation of its underwriting guidelines, failed to make reasonable determinations of borrowers' ability to repay the loans. *See id.* at ¶ 26. Under Defendant's underwriting guidelines, borrowers' stated incomes must be reasonable based on their stated income source, employment position, current credit profile, and other factors. *Id.* at ¶ 25. Many borrowers' stated incomes and stated debts were allegedly unreasonable given the circumstances, and Defendant "ignored clear red flags that indicated that the borrower was unlikely to be able to repay the loan." *Id.* at ¶ 26. The failure to ensure reasonable stated incomes and stated debts led to inaccurate debt-to-income ("DTI") ratios (the borrower's monthly debt obligations as a percentage of his or her monthly income). *Id.* at ¶ 27. Because Defendant's underwriting guidelines set maximum DTI ratios, failure to ensure reasonable stated incomes resulted in Defendant originating loans outside of its underwriting guidelines. *See id.*

Loan-to-value ("LTV") [1] or combined loan-to-value (CLTV) [2] ratios allegedly exceeded

erty's value, and the borrower's equity is 20%. *Id.* at ¶ 33.

2. CLTV ratios include all of the liens on the mortgaged property. *Id.*

Defendant's underwriting guidelines. *Id.* at ¶ 33. These ratios are an important factor in assessing the likelihood of default on a mortgage loan. The lower the LTV or CLTV ratio, the more equity the borrower has in the property. A borrower with more equity has a stronger incentive to keep payments current, and a higher equity level protects against loss to the lender in the event of default. *See id.* Plaintiff alleges that inflated appraisals artificially reduced the LTV and CLTV ratios used by Defendant and that the actual ratios exceeded guidelines. *See id.* Plaintiff alleges that appraisal fraud was rampant in the mortgage industry and many appraisers felt pressure to restate, adjust, or change appraisal values. *Id.* at ¶¶ 34, 35. Citing the complaint filed in a Massachusetts lawsuit, Plaintiff alleges that Defendant's employees have stated that Defendant knowingly violated its standards for underwriting and appraisals. *Id.* at ¶ 36.

Plaintiff also alleges that Defendant departed from its underwriting guidelines because some loan files are missing key documentation. *Id.* at ¶ 43. Plaintiff contends that to underwrite loans in accordance with applicable guidelines, an underwriter must have access to all of the documents to determine whether to approve the loan application. *Id.*

Lastly, the Trustee Schedule and the supporting materials allege many granular violations of the representations and warranties, including insufficient credit score, failure to obtain clear title, failure to abide by federal, state, and local lending regulations, among other breaches. *See* Am. Compl. Ex. A.

Defendant responded to the Trustee's letter on July 10, 2012, refusing to cure or repurchase any of the loans. Am. Compl. ¶ 3. Defendant has not cured or repurchased any of the 96 loans to date. *Id.*

## DISCUSSION

■ To prevail on any breach of contract claim under New York law, a plaintiff must plead: (1) the existence of a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages attributable to the breach. *See Beautiful Jewellers Private Ltd. v. Tiffany & Co.,* 438 Fed.Appx. 20, 21–22 (2d Cir.2011). The first two elements are not in dispute, and the Court finds that the fourth element has been established.[3] In support of its motion, Defendant propounds two main arguments: (1) Plaintiff's pleadings are inadequate (attacking the complaint's lengthy exhibits, its alleged failure to satisfy the heightened pleading standard for fraud-related claims, and its incorporation of a complaint from another lawsuit); and (2) Plaintiff has failed to establish the third element, breach (arguing that Plaintiff's allegations regarding the loans do not violate the representations and warranties). The Court will address each argument in turn.

### I. *Pleading Standard*

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, " 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions[ ] and a formulaic recitation of the elements of a cause of action." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. In addition, the facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* On a

---

3. The complaint alleges that Defendant breached "with respect to certain loans that are no longer in the Trust, of which many were liquidated with heavy losses to the Trust when borrowers were unable to make their mortgage payments. These losses would have been avoided in many cases had [Defendant] adhered to the underwriting guidelines it represented that it had followed, or truthfully described the nature of these loans." Am. Compl. ¶ 51. "If [Defendant] cannot cure the breach, it is obliged to repurchase the loan if required to do so. The [PSA] defines the 'Purchase Price' at which [Defendant] must repurchase the loan. For breaches related to a mortgage loan already sold from the Trust (typically as a result of foreclosure), [Defendant] must pay the difference between the Purchase Price as calculated immediately prior to the liquidation and any liquidation proceeds." *Id.* at ¶¶ 16, 17 (citation omitted).

12(b)(6) motion to dismiss, a district court may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, documents possessed by plaintiffs, or documents that plaintiffs knew about and relied upon. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002). A district court considering a Rule 12(b)(6) motion must accept all factual allegations in the complaint as true, while also drawing all reasonable inferences in favor of the nonmoving party. *ATSI Commc'ns, Inc.*, 493 F.3d at 98. For fraud claims to survive a motion to dismiss, "a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b).

 For a fraud claim "to comply with Rule 9(b), the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir.2006) (citation and internal quotation marks omitted). A complaint alleging fraud, moreover, must plead facts that give rise to a strong inference of scienter. *S.Q.K.F.C, Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir.1996).

## A. *Lengthy Attachments*

Rule 8 of the Federal Rules of Civil Procedure requires plaintiffs to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R.Civ.P. 8(a)(2). Rule 10 of the Federal Rules of Civil Procedure provides: "A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion. A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed.R.Civ.P. 10(c). Thus, when assessing the legal sufficiency of a claim, the Court may consider "the facts alleged in the complaint, and any document attached as an exhibit to the complaint or incorporated in it by reference." *Miotto v. Yonkers Public Schs.*, 534 F.Supp.2d 422, 425 (S.D.N.Y.2008) (citations omitted).

 Defendant argues that courts dismiss complaints where the "plaintiff sets forth the bulk of its allegations in attachments to the complaint and forces the defendant (and the court) to sift through the attachments to divine the claims and the supporting facts." Def. Mem. 17 (citing *United States v. Erie Cnty.*, 724 F.Supp.2d 357, 367 (W.D.N.Y. 2010); *U.S. ex rel. Garst v. Lockheed–Martin Corp.*, 328 F.3d 374, 378 (7th Cir.2003); *Taurus IP, LLC v. Ford Motor Co.*, 539 F.Supp.2d 1122, 1127 (W.D.Wis.2008)). In all three cases, the attachments or items incorporated by reference failed to link or specify the claims at issue, and instead worked to confuse the courts and the litigants. *See Erie Cnty.*, 724 F.Supp.2d at 367 (the attachment "makes it unnecessarily difficult for [the] [d]efendants to decipher the scope of the allegations underlying each claim"); *Lockheed–Martin*, 328 F.3d at 378 ("[The attached] documents [were] so long, so disorganized, so laden with cross-references and baffling acronyms, that they could not alert either the district judge or the defendants to the principal contested matters.").

Exhibit A to the complaint contains the Trustee Schedule, which identifies the 96 loans where breach is alleged. *See* Am. Compl. Ex. A. By means of well-organized columns and rows, the Trustee Schedule identifies for each loan which of the representations Defendant allegedly breached (citing the specific provision of the Purchase Agreement) and the grounds for alleging breach (in thorough yet succinct paragraphs). *See id.* The allegations of breach in the attachment are specific enough to satisfy the requirements of Rule 8. Unlike the attachments or materials incorporated by reference in *Erie Cnty., Lockheed–Martin,* and *Taurus,* the Trustee Schedule here is user-friendly and ties the specific allegations of breach to the specific clauses of the contract, giving Defendant more than sufficient notice of what Plaintiff's claims are and upon what grounds they rest. Although the supporting materials (the loan files, underwriting guidelines, etc.) could be better organized (*i.e.,* arranged in the same order as the loans are listed in the Trustee Schedule), this does not

doom Plaintiff's pleadings. The supporting materials for each loan appear together, and the loan number is clearly labeled before each consolidated group of documents. And, the relevant portions of the supporting materials are highlighted in yellow or circled in red font. Thus, referencing the supporting materials with the allegations contained in the Trustee Schedule can be accomplished without great difficulty.

## B. *Fraud Pleading*

Plaintiff asserts breach of contract claims, which typically only need to meet the pleading requirements of Fed.R.Civ.P. 8(a). However, Defendant argues that because many of the complaint's allegations sound in fraud, they are subject to the heightened pleading standard of Fed.R.Civ.P. 9(b). Plaintiff argues that the underlying allegations of fraud in the complaint (by borrowers when reporting income, debt, and employment and by appraisers when performing appraisals) are not subject to Rule 9(b). Plaintiff states that Defendant has failed to point to any cases where "Rule 9(b) applies 'at one remove'— i.e., when (as here) the fraud alleged is not by the defendant but by a third-party." Pl. Mem. 26 (underline in original).

■ Rule 9(b) applies to "claims insofar as the claims are premised on allegations of fraud. By its terms, Rule 9(b) applies to 'all averments of fraud.' This wording is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." *Rombach v. Chang,* 355 F.3d 164, 171 (2d Cir.2004) (citation omitted).[4] Thus, it is hardly Defendant's burden to prove that "all" does not mean all. *See id.* (emphasis added) ("Rule 9(b) applies to '*all* averments of fraud.' "). And, courts in this district have applied Rule 9(b) "at one remove" to allegations of fraud committed by third parties. *See, e.g., JSC Foreign Econ. Ass'n Technostroyexport v. Weiss,* No. 06 Civ. 6095, 2007 WL 1159637, at *11 (S.D.N.Y. Apr. 18, 2007).

Thus, Rule 9(b) applies to the allegations of fraud here, even if they are directed at third parties.

■ Plaintiff argues that even if Rule 9(b) applies (which it does), the complaint satisfies the Rule's requirements. With respect to borrower fraud, Plaintiff states that, "the complaint and its exhibits identify the speaker (i.e., the borrower), the false statement (e.g., misstatement of income or debt), where the statement was made (the loan application), and the grounds for saying that the statement was false (e.g., a subsequent bankruptcy filing revealing the borrower's true income at the time of his loan application)." Pl. Mem. 26–27 (underline in original). In response, Defendant argues that "Plaintiff cannot rely on the exhibits attached to its Amended Complaint to establish the particularized facts necessary to plead a fraud claim for each of the loans as to which it alleges some type of fraud," citing *W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc.,* 287 Fed.Appx. 81, 87 (11th Cir.2008). Def. Reply Mem. 11–12. In *W. Coast Roofing,* the court held that generalized allegations in voluminous documents attached to the complaint that allegedly contained examples of false statements failed to satisfy Rule 9(b). *Id.* Defendant's citation to *W. Coast Roofing* is nothing more than a rehashing of its 'lengthy attachment' argument, which was rejected above. The allegations of borrower fraud cite the specific representation breached and detail the four items required to be specified by Rule 9(b) in succinct paragraphs. *See Lerner,* 459 F.3d at 290. Thus, unlike the fraudulent allegations in *W. Coast Roofing,* the exhibit to the complaint affords Defendant more than enough particularized notice of the allegations against it. *Cf.* 287 Fed.Appx. at 87.

## C. *Incorporation of Allegations from Another Complaint*

■ Plaintiff must also satisfy the requirements of Rule 9(b) with respect to its allega-

---

4. In its current form, Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). The language, "all averments of fraud," was dropped by the 2007 amendment; however, the change was "intended to be stylistic only." Fed.R.Civ.P. 9(b), Advisory Committee Notes, 2007 Amendment.

tions of fraud by appraisers. In support of its allegations, Plaintiff alleges that appraisal fraud was rampant in the mortgage industry and many appraisers felt pressure to restate, adjust, or change appraisal values. Am. Compl. ¶¶ 34, 35. Citing the complaint of a different lawsuit, Plaintiff also alleges that Defendant's employees have stated that Defendant knowingly violated its standards for underwriting and appraisals. *Id.* at ¶ 36. The Trustee Schedule also includes allegations that appraisers failed to complete accurate evaluations. Plaintiff states that certain properties failed to include photographs of the subject property and comparable properties. *See, e.g.,* Am. Compl. Ex. A. at 36 ("The Lender's guidelines required appraisals to be ... complete and accurate evaluation[s] of the property.... The appraisal provided was missing interior photos of the subject property and photos of the comparable properties. Per the underwriting approval, interior photos were required for final approval."). Plaintiff also states that appraisal values were not supported in some properties, citing inconsistencies between information contained in the appraisal report and the actual property. *See id.* at 43 ("[A]ll improvements must be legally permitted.... The appraiser indicated the subject was a 2 unit property; however, public records reflect the subject is a one family dwelling with 100 amp electrical service.... There is no evidence to support the subject is a legal 2 unit property."). *See also* Am. Compl. ¶ 40 (alleging inflated appraisal value of $182,000 where property had a true purchase price of $119,700).

The allegations of inaccurate appraisals and failure to follow proper protocol are, standing alone, insufficient to support a strong inference of fraudulent intent by the appraisers, as required by Rule 9(b). *See Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.,* 902 F.Supp.2d 476, 493 (S.D.N.Y.2012) (although many inaccurate appraisals can provide circumstantial evidence of fraudulent intent, such evidence must be supported by additional circumstantial evidence in order for the plaintiff to carry her pleading burden). Allegations of industry-wide appraisal fraud offer little support—certainly not enough to lift the inaccurate appraisal allega-

tions above Rule 9(b)'s hurdle. *See In Re IndyMac Mortg.-Backed Sec. Litig.,* 718 F.Supp.2d 495, 510 (S.D.N.Y.2010) (industry-wide allegations of appraisal fraud do not create an inference "that the appraisers of the properties underlying the [c]ertificates ... succumbed to [pressure] in a way that violated USPAP").

Citing the complaint of *Cambridge Place Investment Management Inc. v. Morgan Stanley & Co., Inc.,* Case No. 10–2741–BLS1 (Mass. Sup.Ct. Suffolk Co. Oct. 14, 2011), Plaintiff also alleges that Defendant's employees have stated that Defendant knowingly violated its standards for underwriting and appraisals. Am. Compl. ¶ 36. One confidential witness, a former underwriter of Defendant, allegedly averred that " '[o]f course [appraisers] inflated values,' and ... if an underwriter questioned the appraised value, the account executive and branch manager would override the underwriter's objection, as with any other red flag in a loan file." *Id.* Similarly, another confidential witness, a staff review appraiser of Defendant from January 2004 to May 2007, "stated that the appraisals 'were all bad.' He considered the appraisals borderline fraudulent, not merely, incompetent, but was unable to prevent loans based on the flawed appraisals." *Id.* When he objected to the bad appraisals, "the loan officer would complain to the branch manager, who would complain to the Appraisals Department at headquarters in Irvine, California, and on up the chain until someone high enough in the Underwriting and Sales Department said to go forward with the loan." *Id.* An Assistant Vice President of Defendant from 2005 to 2007 who worked in the Correspondent Lending department stated that when he raised concerns about loan quality, he was essentially told, " 'Shut up, Wall Street will buy it; don't worry about it.' " *Id.*

The Second Circuit has not ruled on whether plaintiffs can rely on confidential witnesses cited in another complaint to meet their pleading burden. *In re Lehman Bros. Sec. & Erisa Litig.,* No. 10 Civ. 6637, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) ("the Second Circuit does not appear to have ruled on this exact issue"). In this district,

utilizing allegations drawn from other complaints has been accepted in some cases, *see In re Bear Stearns Mortgage Pass–Through Certificates Litig.*, 851 F.Supp.2d 746, 768 n. 24 (S.D.N.Y.2012); *380544 Canada, Inc. v. Aspen Tech., Inc.*, 544 F.Supp.2d 199, 224–25 (S.D.N.Y.2008), but rejected in others, *see VNB Realty, Inc. v. Bank of Am. Corp.*, No. 11 Civ. 6805, 2013 WL 5179197, at *7 (S.D.N.Y. Sept. 16, 2013); *Lehman Bros.*, 2013 WL 3989066, at *4.

This Court will consider the allegations incorporated from the *Cambridge Place* complaint. "It is not the burden of the [P]laintiff[ ] to show that it is permissible for [it] to quote accounts of confidential sources from a separate proceeding; rather, it is [Defendant's] burden to show that Plaintiff[ ] may *not* do so." *380544 Canada, Inc.*, 544 F.Supp.2d at 224 (emphasis in original). Defendant argues that Rule 11 of the Federal Rules of Civil Procedure prohibits the use of confidential witness statements from a different complaint because the Rule requires counsel to certify that he has spoken with the confidential witnesses and knows who they are. However, Rule 11 only requires that counsel certify "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances ... the factual contentions have evidentiary support or, *if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.*" Fed. R.Civ.P. 11(b)(3) (emphasis added). Thus, Rule 11 seems to allow incorporation of allegations from other complaints if they are combined with material the plaintiff has investigated personally that lend credence to the borrowed allegations. *See, e.g., In re Connetics Corp. Secs. Litig.*, 542 F.Supp.2d 996, 1005 (N.D.Cal.2008) (citation omitted) (noting that "an attorney may rely in part on other sources ... as part of his or her investigation into the facts"); *In re Cylink Secs. Litig.*, 178 F.Supp.2d 1077, 1080 (N.D.Cal. 2001) (holding that a complaint can combine

the plaintiff's own allegations with allegations from an SEC complaint).

The complaint here states that the confidential witness statements were included "on information and belief in their truth and on reasonable belief that further inquiry and discovery from [D]efendant and others will provide evidence of [their] truth." Am. Compl. ¶ 36. And, the confidential witness statements are buttressed by allegations of bad appraisals in the specific loans at issue. *See id.* at ¶ 40; Am. Compl. Ex. A. Additionally, the statements contain their own indicia of reliability. The quotes are from a number of different employees (not from one possible disgruntled or vindictive employee), who worked in different geographic areas and in different positions throughout the company.[5] Because they report a consistent pattern of behavior, the Court has more faith in their accuracy. *See Bear Stearns*, 851 F.Supp.2d at 768 n. 24 (complaints replete with detailed factual information are better for borrowing than others). Coupled with the confidential witness statements from the *Cambridge Place* action, the Court finds that the allegations of appraisal fraud in the complaint satisfy Rule 9(b).

Because the complaint's pleadings are adequate, the Court will turn to the issue of whether the allegations in the complaint constitute breach under the Purchase Agreement.

## II. *First Cause of Action—Breach of Representations and Warranties*

Because the Court has already decided to consider the Trustee Schedule of 96 loans and the supporting materials attached to the complaint, Defendant's motion to dismiss the complaint in its *entirety* is impracticable. In the complaint, Plaintiff discussed only five of the 96 loans from the Trustee Schedule, leading Defendant to argue that "Plaintiff attempts to impute to the 96 loans ... breaches of representations based on five loans identified in the Amended Complaint." Def.

---

**5.** The confidential sources have been "described in the complaint with sufficient particularity to support the probability that a person in that position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216

F.3d 300, 314 (2d Cir.2000). Underwriters, review appraisers, and executives would have all been privy to the information alleged by the confidential witnesses in the complaint.

Mem. 7. Defendant proceeds to attack the five loans referenced in the complaint, ignoring most of the loans on the Trustee Schedule. However, many of the loans in the Trustee Schedule demonstrate textbook breach. For example, the Trustee Schedule states for Loan No. XXXXX6374: "The Lender's guidelines stated the maximum LTV for a Stated Income loan, approved under the Latitude program with a 579 credit score was 80%. The subject loan was approved at 85% LTV, which exceeded the guideline maximum allowable LTV of 80%." Am. Compl. Ex. A., at 18. The supporting materials for Loan No. XXXXX6374 contain Defendant's underwriting guidelines, which indicate that for borrowers with FICO [6] scores between 500–599, the maximum LTV ratio is 80%. The Loan Approval form indicates that the borrower's FICO was below 600 and the LTV ratio was 85%.[7] Thus, Plaintiff has sufficiently stated that the loan breaches the representation promising that "[e]ach Mortgage Loan was originated substantially in accordance with the Originator's underwriting criteria." Purchase Agreement § 3.01(a)(28), Stern Decl. Ex. 2, at 11. Indeed, the Trustee Schedule is chock full of obvious examples of breach. *See, e.g.,* Am. Compl. Ex. A, at 30 ("The Lender's guidelines stated the maximum CLTV for a Full Documentation loan with a 547 credit score, approved under the Latitude Advantage AA program is 85%. The subject loan was approved at 90% CLTV, which exceeded the maximum allowable CLTV of 85%"); *id.* at 40 ("The Lender's guidelines stated the maximum LTV for a Stated Income Loan, under the Latitude program with a credit score of 585 was 80%. The subject loan was approved at 85% LTV, which exceeded the guideline maximum allowable LTV of 80%"). The only credible argument that these loans do not constitute breach of § 3.01(a)(28) is that the prospectus supplement "allows for variances to the appraisal based on a review of such appraisal, the loan-to-value ratio

("LTV") and other risk factors." Stern Decl. Ex. 6. However, whether such reviews took place is an issue of fact that cannot be decided on a motion to dismiss.

The Court will address the issues raised by Defendant in turn.

### A. Verification Guidelines

 Plaintiff alleges that Defendant breached guidelines requiring Defendant to verify the accuracy of the borrower's income, employment, and existing debt obligations. Defendant's underwriting guidelines require "a reasonable determination of an applicant's ability to repay the loan." *Id.* "Such determination is based on a review of the applicant's source of income, calculation of a debt service-to-income ratio based on the amount of income from sources indicated on the loan application or similar documentation, a review of the applicant's credit history and the type and intended use of the property being financed." *Id.* For stated income loans, the underwriting guidelines require the underwriter to ensure that the stated income is "reasonably based on factors including ... income source, employment position, and/or ... credit profile." Otero Decl. Ex. I, at 4–1. Defendant argues that Plaintiff's claims fail because Plaintiff applies the wrong or non-existent guidelines. Resorting to sophistry, Defendant contends that because the guidelines say nothing about the specific allegations which support Plaintiff's claims, no guidelines have been breached. For example, Defendant argues that there are no guidelines which require loan files to contain employment verification or income documentation (thus, loans missing those documents are not in breach). However, in so arguing, Defendant ignores the guidelines' umbrella mandate of reasonableness under which Plaintiff's allegations fall. The absence of such documentation from the loan file supports a plausible inference that the underwriter failed to reasonably determine the

---

**6.** FICO scores are a widely used metric of creditworthiness, created by Fair, Isaac, and Company, that assess the likelihood that a person will pay his or her debts. FICO scores range from 300 to 850. Higher scores indicate lower credit risk.

**7.** Note: This is *not* an instance where Plaintiff is arguing that the LTV ratio is above guidelines because the appraisal was inflated. Plaintiff is simply taking the LTV ratio as is (85%) and demonstrating that it does not comport with the guidelines (regardless of whether the appraisal was accurate).

applicant's ability to repay the loan. Although it may be possible that the underwriter, for example, verified income by telephone or possessed and considered a borrower's tax return but misplaced it in the wrong file, such hypotheticals can only be confirmed or dismissed after discovery.

Defendant's other arguments along the same lines are similarly unavailing. Defendant states that an application from a borrower who claims to be self-employed, but receives his income from another employer does not violate any guidelines. Defendant argues that there is nothing fishy about the loan—the self-employed borrower could have been working as an "independent contractor at the time, which would be consistent with the borrower's stated position as 'self-employed.' " Def. Mem. 15. However, at the motion to dismiss stage, the Court must view the facts in the light most favorable to the non-moving party and cannot blindly accept Defendant's hypothetical. Likewise, on a different loan, Defendant argues no representation was breached when the underwriter allegedly ignored nine credit inquires listed on the origination report because the guidelines do not require an underwriter to assess a borrower's potential pending liabilities. However, Defendants cannot be heard to say that a borrower's potential pending liabilities have no effect on his "ability to repay the loan"—a reasonable determination the underwriter is required to make, pursuant to the guidelines. Stern Decl. Ex. 6.

Defendant's motion to dismiss Plaintiff's verification-related breach of contract claims is DENIED.

### B. *Appraisals/LTV Ratios*

Defendant advances several theories why Plaintiff is unable to demonstrate breach regarding appraisals and/or LTV ratios. The Court will address each in turn.

### i. *Did Defendant Represent the Accuracy of Appraisal Values?*

The Purchase Agreement represents that "[t]he information set forth on each Schedule is true and correct in all material respects as of the Cut-off Date or such other date as may be indicated in such schedule." Purchase Agreement § 3.01(a)(4), Stern Decl. Ex. 2, at

7. Plaintiff argues that "Schedule" refers to the Mortgage Loan Schedule, which contains appraisal values and LTV ratios, and thus the provision represents that "the mortgaged property's appraised value, and loan-to-value ratios, among other information" are true and correct. Am. Compl. ¶ 13. Defendant, on the other hand, contends that "Schedule" refers to the schedules attached to the PSA in Exhibit D, which contain no appraisal values or LTV ratios. Def. Reply Mem. 2. Thus, allegations of inaccurate appraisals or incorrect LTV ratios do not constitute breach.

A written contract must be interpreted according to the parties' intent, which is "derived from the plain meaning of the language employed in the agreements." *In re Lehman Bros. Inc.*, 478 B.R. 570, 586 (S.D.N.Y.2012) (citation and internal quotation marks omitted). In a dispute over the meaning of a contract, the threshold question is whether the contract terms are ambiguous, *see, e.g., Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir.2000), which is a question of law for the Court to decide on a claim-by-claim basis. *See Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 197 (2d Cir.2005). A contract is unambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir.2012) (citation and internal quotation marks omitted). By contrast, "ambiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 53 (2d Cir.2012) (citation and internal quotation marks omitted). Ambiguity "can arise either from the language itself or from inferences that can be drawn from th[e] language." *Alexander & Alexander Servs., Inc.*

*v. These Certain Underwriters at Lloyd's, London, England,* 136 F.3d 82, 86 (2d Cir. 1998). The language of a contract, however, "is not made ambiguous simply because the parties urge different interpretations." *O.D.F. Optronics Ltd. v. Remington Arms Co.,* No. 08 Civ. 4746, 2008 WL 4410130, at *11 (S.D.N.Y. Sept. 26, 2008) (citation and internal quotation marks omitted). Further, a court must avoid any interpretation that would be "absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." *Landmark Ventures, Inc. v. Wave Sys. Corp.,* No. 11 Civ. 8440, 2012 WL 3822624, at *3 (S.D.N.Y. Sept. 4, 2012) (citation and internal quotation marks omitted).

 Where a contract's language is clear and unambiguous, a court may dismiss a breach of contract claim on a Rule 12(b)(6) motion to dismiss. *See Rounds v. Beacon Assocs. Mgmt. Corp.,* No. 09 Civ. 6910, 2009 WL 4857622, at *3 (S.D.N.Y. Dec. 14, 2009) (citation and internal quotation marks omitted) ("Where there is no ambiguity to a contract and the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law, and a claim turning on that interpretation may be resolved on a motion to dismiss."). But, "when the language of a contract is ambiguous, its construction presents a question of fact, which of course precludes summary dismissal" on a Rule 12(b)(6) motion. *Crowley v. VisionMaker, LLC,* 512 F.Supp.2d 144, 152 (S.D.N.Y.2007) (citation and internal quotation marks omitted).

 Here, the contract is ambiguous as to whether the word "Schedule" in § 3.01(a)(4) refers to the Mortgage Loan Schedule, which contains appraisal and LTV data, or the schedules attached to the PSA in Exhibit D, which do not. Defendant argues that "Schedule" as defined by § 2.02 of the Purchase Agreement is a list of mortgage loans containing the loans' account numbers

and principal balances.[8] Defendant has not established this. The term "Schedule" is not defined in § 2.02. *See* Stern Decl. Ex. 2, at 3–4. Indeed, § 1.01 is the Purchase Agreement's definitions section, and it contains no definition of "Schedule." *Id.* at 3. Section 1.01 states, "[a]ll capitalized terms used but not defined herein and below shall have the meanings assigned thereto in the Pooling and Servicing Agreement." *Id.* The PSA also fails to define "Schedule." *See* PSA § 1.01, Stern Decl. Ex. 3.

Section 2.02 only sets forth Defendant's obligation to deliver information, and delineates where the information will appear and how the information will be labeled (as "Schedules I–X"). Stern Decl. Ex. 2, at 3–4. However, the mere fact that a different set of information is labeled "Schedules" creates the possibility that ambiguity could exist (because "Schedule" can plausibly mean more than one thing). And, Defendant's second argument establishes that ambiguity exists regarding which "Schedule" § 3.01(a)(4) refers to. Other representations listed in § 3.01(a) refer specifically to the "Mortgage Loan Schedule," not just "Schedule." *See, e.g.,* Purchase Agreement § 3.01(a)(12), Stern Decl. Ex. 2, at 8–9 ("as set forth in the Schedule of Mortgage Loans"); Purchase Agreement § 3.01(a)(55), Stern Decl. Ex. 2, at 14 ("unless otherwise specifically disclosed in the Mortgage Loan Schedule"). Defendant argues that the reference to "Schedule," and not "Mortgage Loan Schedule" in § 3.01(a)(4) is deliberate, because when the contracting parties wanted to refer to the Mortgage Loan Schedule, they did so expressly. Although it is true that use of two different terms in the same provision can give rise to an inference that different meanings should be assigned to each term, *see Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp.,* 93 F.3d 1572, 1579 (Fed.Cir.1996), the inference is not conclusive: "[I]t is not unknown for different words to be used to

---

8. Section 2.02 of the Purchase Agreement states: "In connection [with the transfer of loans provided for in the Purchase Agreement], the Originator further agrees . . . to deliver to the Purchaser and the Trustee a computer file containing a true and complete list of all such Mortgage Loans specifying for each such Mortgage Loan, as of

the Cut-off Date (i) its account number and (ii) the Cut-off Date Principal Balance. Such files, which form a part of Exhibit D to the Pooling and Servicing Agreement, shall also be marked as Schedules I–X to this Agreement and are hereby incorporated into and made a part of this Agreement."

express similar concepts, even though it may be poor drafting practice." *Bancorp Services, L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed.Cir.2004). And, common sense may tilt in favor of Plaintiff's interpretation. Assuming the point of the representations and warranties is to guard the purchaser against the credit risks associated with bad loans, it is unclear how a representation guaranteeing the accuracy of the account numbers would serve that purpose. Would the parties really bargain for typo-protection? However, a provision ensuring the accuracy of the loans' principal balances is understandable. All this to say, the meaning of "Schedule" in § 3.01(a)(4) is ambiguous, which precludes the Court from dismissing at this time Plaintiffs breach of contract claims for inaccurate appraisals and LTV ratios.

### ii. *Are the Appraisals Non–Actionable Opinions?*

■ In the alternative, Defendant argues that assertions of inflated appraisals do not render false Defendant's representations concerning the original appraisal values of the loans at issue because appraisals are nonactionable opinions. Appraisals are indeed statements of opinion. *Employees' Ret. Sys. of the Gov't of the Virgin Islands v. J.P. Morgan Chase & Co.*, 804 F.Supp.2d 141, 153 (S.D.N.Y.2011) (citations and internal quotation marks omitted) ("An appraisal is a subjective opinion based on the particular methods and assumptions the appraiser uses"). "But although . . . appraisals are matters of opinion in one sense, they also constitute factual statements: that the appraised value represents the appraiser's true belief as to the value of the property." *Fed. Hous. Fin. Agency v. UBS Americas, Inc.*, 858 F.Supp.2d 306, 326 (S.D.N.Y.2012), *aff'd*, 712 F.3d 136 (2d Cir.2013). In *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1092–96, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), the Supreme Court held that a statement of opinion is false and actionable only if the opinion is both (1) objectively untrue and (2) not believed by the speaker. *See also Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir.2011). To establish objective falsity in other RMBS cases, plaintiffs have run

sampled mortgage loans through an automated valuation model to estimate the true property value at the time of origination and then compared those values to the appraised values. *See Fed. Deposit Ins. Corp. v. Chase Mortgage Fin. Corp.*, No. 12 Civ. 6166, 2013 WL 5434633, at *8 (S.D.N.Y. Sept. 27, 2013); *UBS*, 858 F.Supp.2d at 328. Subjective falsity is established where either the appraiser or the person who reported the appraiser's opinion did not honestly believe the appraisal value. *See In re Bear Stearns Mortgage Pass–Through Certificates Litig.*, 851 F.Supp.2d 746, 769 (S.D.N.Y.2012); *UBS*, 858 F.Supp.2d at 326.

■ Here, the complaint alleges that "the appraised values of the properties used by [Defendant] in calculating [LTV and CLTV] ratios were inflated." Am. Compl. ¶ 33. By way of example, Plaintiff states that Loan No. XXXXX7167 had an appraised value of $182,000 in June 2006, but the true purchase price of the property in November 2005 was $119,700. *Id.* at ¶ 40. Although the sample is smaller than in *Chase* or *UBS*, a large disparity between the true purchase price and the appraised value makes plausible Plaintiff's claim that appraised values were "objectively false," as it seems unlikely a property's value would appreciate 52% in just seven months. Plaintiff has also sufficiently pleaded subjective falsity. *See* Am. Compl. ¶ 36 ("With respect to artificially inflated appraisals, [Confidential Witness # 52] stated that '[o]f course they inflated values' and that if an underwriter questioned the appraised value, the account executive and branch manager would override the underwriter's objection, as with any other red flag in a loan file"); *id.* ("[A] staff review appraiser for [Defendant] . . . stated that the appraisals 'were all bad.' He considered the appraisals borderline fraudulent, not merely incompetent, but was unable to prevent loans based on the flawed appraisals.").

Thus, Defendant's motion to dismiss Plaintiff's appraisal-related breach of contract claims is DENIED.

### C. *Mortgage Note Representation*

■ Section 3.01(a)(16) of the Purchase Agreement represents that "[t]here is no material default, breach, violation or event of

acceleration existing under the related Mortgage or the related Mortgage Note ... other than a payment delinquency." Stern Decl. Ex. 2, at 9. Plaintiff alleges that "[a] borrower's failure to accurately and fully describe his income, debts, and employment are material defaults, breaches and violations under the borrower's mortgage and mortgage note" and that such failure constitutes breach under § 3.01(a)(16). Am. Compl. ¶ 32. Defendant argues that Plaintiff has not alleged breach of § 3.01(a)(16) because the mortgages and mortgage notes do not warrant the accuracy of borrower statements about income, existing debt obligations or employment. Review of a sample mortgage and mortgage note confirms that they do not make such warranties. *See* Stern Reply Decl. Ex. 1, 2. Instead, they refer to the borrower's rights and obligations under the note, including, for example, the borrower's right to make payments of principal at any time, his obligation to pay a specified amount plus interest in return for the loan, and his obligation to insure the property. The only plausible counterargument is that "Mortgage" refers not just to the instrument creating the lien on the property, but also to the mortgage loan and files (which would contain borrower descriptions of income, debt, and employment). However, Plaintiff does not advance this argument, and the definition section of the PSA contains separate definitions for "Mortgage," "Mortgage Loan," and "Mortgage Files," which confirms "Mortgage" in § 3.01(a)(16) simply refers to the debt instrument. PSA § 1.01, Stern Decl. Ex. 3, at 35.

Thus, Defendant's motion to dismiss Plaintiff's breach of contract claims under § 3.01(a)(16) is GRANTED.

### D. *Material Adverse Effect*

A breach by Defendant must materially and adversely affect the value of a loan or materially and adversely affect the interests of the Trust and its certificate holders in the loan to activate Defendant's obligation to cure or repurchase the loan. *See* Purchase Agreement § 3.04, Stern Decl. Ex. 2. The complaint alleges that Defendant represented that "the loans met credit quality standards that indicated that borrowers would

be able to repay their loans," and therefore alleged breaches have "a material and adverse effect on the value of the loans and the interests of the Certificateholders in the loans" by creating an increased credit risk. *Id.* at ¶ 15. Defendant argues that to prove that a breach "materially and adversely affects the value" of the mortgage loan, Plaintiff must prove that a particular loan defaulted. Def. Sur-reply Mem. 1. Defendant is incorrect. *See Syncora Guarantee Inc. v. EMC Mortg. Corp.*, 874 F.Supp.2d 328, 335 (S.D.N.Y.2012) ("Contrary to [the defendant's] argument, the parties' written agreements do not provide that breaches ... must cause [the loans] to default.... Had the parties intended this requirement, they could have included such language."). *See also Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, No. 10 Civ. 9584, 2013 WL 1285289, at *10 (S.D.N.Y. Mar. 28, 2013) ("In keeping with other courts' approaches, the [c]ourt declines to equate ['material adverse effect'] with causing the loan to default."). Plaintiff, therefore, has pleaded that the breaches materially and adversely affect the value of the loans or the interests of the Trust and the certificate holders in the loans.

Accordingly, Defendant's motion to dismiss Plaintiff's first cause of action is GRANTED, only to the extent that the mortgage note representation claims are dismissed.

### III. *Second Cause of Action—Breach of the Duty to Cure or Repurchase*

 Plaintiff also brings a claim of breach of the duty to cure or repurchase, arguing that Defendant breached an independent obligation to repurchase defective loans under § 3.04 of the Purchase Agreement. Am. Compl. ¶¶ 53–55. Defendant argues that the claim fails as a matter of law because the repurchase provision is merely a remedy for the breach of a § 3.01 representation, not a separate promise that can give rise to an independent cause of action. *See Nomura Asset Acceptance Corp. Alt. Loan Trust, Series 2005–S4 ex rel. HSBC Bank USA, Nat. Ass'n v. Nomura Credit & Capital, Inc.*, No. 653541/2011, 39 Misc.3d 1226(A), 2013 WL 2072817, at *8 (N.Y.Sup.

Ct. May 10, 2013). In *Nomura*, the court rejected the plaintiff's independent breach argument and stated that "[t]he repurchase obligation in this case is merely a remedy. It is not a duty independent of the Mortgage Representation breach of contract claims." *Id.* Plaintiff states that the state courts are split on this issue, citing *ACE Sec. Corp. v. DB Structured Products, Inc.*, 40 Misc.3d 562, 965 N.Y.S.2d 844 (N.Y.Sup.Ct.2013), where the court held that the plaintiff had a claim for breach of an originator's repurchase obligation. Plaintiff notes that the losing parties in both *Nomura* and *ACE* have noticed appeals to the First Department, and asks that the Court deny Defendant's motion with leave to renew the motion after the First Department clarifies the applicable law. The Court denies Plaintiff's request, as the First Department has reversed *ACE*, *see ACE Sec. Corp. v. DB Structured Products, Inc.*, 112 A.D.3d 522, 977 N.Y.S.2d 229 (1st Dep't 2013), and other case law has already addressed the issue in Defendant's favor. *See Walnut Place LLC v. Countrywide Home Loans, Inc.*, 96 A.D.3d 684, 684–85, 948 N.Y.S.2d 580 (1st Dep't 2012) (holding that the repurchase provision in the purchase agreement "merely provides for a remedy in the event of a breach," not independent grounds for suit). *See also Deutsche Alt–A Sec. Mortgage Loan Trust, Series 2006–OA1 v. DB Structured Products, Inc.*, No. 12 Civ. 8594, 2013 WL 3863861, at *10 (S.D.N.Y. July 24, 2013) (distinguishing *ACE* and holding that a failure to repurchase is "not an independent breach").

Accordingly, Defendant's motion to dismiss Plaintiff's second cause of action is GRANTED.

## IV. *Third Cause of Action—Indemnification*

In its third cause of action, Plaintiff seeks indemnification for its losses, costs, fees, and expenses arising out of and related to the breaches of Defendant's representations and warranties (namely, the costs incurred in bringing the current litigation). Am. Compl. ¶¶ 57, 58. Section 5.01(e) of the Purchase Agreement contains an indemnification provision, which provides that Defendant will indemnify and hold harmless the Purchaser, the Trustee, and the certificate holders for "legal fees and related costs . . . arising from a breach by the Originator of its representations and warranties in Section 3.01 and 3.02 of this Agreement." Stern Decl. Ex. 2, at 26.

Because promises in a contract to indemnify the other party's attorney's fees and related costs "run against the grain of the accepted policy that parties are responsible for their own attorneys' fees," *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199 (2d Cir.2003), courts applying New York law do not infer a party's intention to indemnify such costs "unless the intention to do so is unmistakably clear from the language of the promise." *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 492, 549 N.Y.S.2d 365, 548 N.E.2d 903 (1989). In *Hooper*, the New York Court of Appeals refused to read an attorneys' fees provision as including claims between the parties themselves, as opposed to third-party claims, where the provision did not "exclusively or unequivocally" refer to such claims or otherwise "support an inference that defendant promised to indemnify plaintiff for counsel fees in an action on the contract." *Id.* Reading the contract as a whole, the court also observed that its narrow interpretation of the indemnity clause was "supported by other provisions in the contract which unmistakably relate[d] to third-party claims." *Id.* To read the indemnity clause as covering suits between the parties, the court found, would render other provisions "meaningless." *Id.* Following the rule laid down in *Hooper*, courts resolve any ambiguity in favor of excluding first-party coverage. *In re Refco Sec. Litig.*, 890 F.Supp.2d 332, 350 (S.D.N.Y. 2012) (Rakoff, J.) ("[A]ny ambiguity on the question . . . requires a finding that attorney fees in suits between the contracting parties are not covered.").

Plaintiff argues that the Purchase Agreement unequivocally extends indemnity to claims between the parties because § 3.04, the remedies provision, provides that Defendant's obligation to "cure, repurchase and substitute for a defective Mortgage Loan and to indemnify the Purchaser as provided in Section 5.01 constitute the sole remedies of

the Purchaser respecting a missing or defective document or a breach of the representations and warranties contained in Section 3.01, 3.02 or 3.03." Stern Decl. Ex. 2, at 22. However, the indemnification referenced in § 3.04 is available only "as provided in Section 5.01," *id.*, and § 5.01 provides for indemnification in only four circumstances, none of which mention actions to enforce the "cure, repurchase and substitute" remedy for a breach of the representations and warranties.[9] Plaintiff argues that "it is difficult to imagine how" a third party could bring an action for breach of the representations that Defendant made to the Trustee. Pl. Mem. 31. Plaintiff is incorrect. An action where the certificate holders sue the Trustee for failing to enforce the repurchase remedy requires little imagination. *See, e.g.*, Second Am. Compl., *Ret. Bd. Of Policemen's Annuity & Benefit Fund v. Bank of N.Y. Mellon*, No. 11 Civ. 5459 (S.D.N.Y. June 17, 2013), ECF No. 89 (action by certificate holders against a trustee alleging that the trustee failed to enforce the mortgage originator's repurchase obligation); Second Am. Compl., *Ok. Police Pension & Ret. Sys. v. U.S. Bank Nat'l Ass'n*, 291 F.R.D. 47 (S.D.N.Y.2013), ECF No. 24 (same).

As in *Hooper*, the indemnification provision contains clauses which unmistakably relate to third-party claims. Section 5.01(c) requires prompt notice and provides the indemnifying party the right to substitute counsel. Stern Decl. Ex. 2, at 24. Defendant argues that these provisions requiring notice of third-party claims and assumption of the defense against third-party claims would make little sense if indemnification was intended for claims between parties to the indemnity. *See Hooper*, 74 N.Y.2d at 492–93, 549 N.Y.S.2d 365, 548 N.E.2d 903 ("[T]he requirement of notice and assumption

of the defense has no logical application to a suit between the parties."). Plaintiff argues that *Hooper* is inapposite because § 5.01(e) also addresses notice and assumption of the defense and specifically references third-parties: "The Originator shall immediately notify the Purchaser, the Trustee and each Certificateholder if a claim is made by a third party with respect to this Agreement. The Originator shall assume the defense of any such claim." Stern Decl. Ex. 2, at 26. Plaintiff argues that by specifically carving out third-party claims and making an express provision for notice and assumption of the defense for such claims, § 5.01(e) is acknowledging that there is another class of claims which need no notice or assumption of the defense rules, citing *Promuto v. Waste Mgmt., Inc.*, 44 F.Supp.2d 628, 651 (S.D.N.Y. 1999). PL Mem. 34.

In *Promuto*, the court stated that because the notice requirement and assumption of defense provisions expressly mentioned third-party claims, the rationale of *Hooper* did not apply. *Promuto*, 44 F.Supp.2d at 651. However, the court first found that the indemnification provision applied to both third-party claims and claims between the parties because of other language in the contract, and merely stated that reference to third-party claims in the notice and assumption of the defense clauses "also support this interpretation." *Id.* The language in § 5.01(e) here that refers specifically to third-parties provides some evidence that claims between the parties were contemplated because courts generally avoid interpretations that render contract terms surplusage. *See State–Wide Capital Corp. v. Superior Bank FSB*, No. 98 Civ 817, 1999 WL 258268, at *4 (S.D.N.Y. Apr. 29, 1999).

**9.** Section 5.01(a) provides that the Originator agrees to indemnify the Purchaser for "any and all losses, claims, damages, or liabilities" that "arise out of or are based upon" material misstatements or omissions of the Originator in the Prospectus Supplement, on any computer tape furnished to the Trustee, or in any other marketing material. Stern Decl. Ex. 2, at 23. Section 5.01(e) provides that the Originator agrees to indemnify the Purchaser, the Trustee, and the certificate holders against "any and all claims, losses, penalties, fines, forfeitures, legal fees and

related costs, judgments, and any other costs, fees and expenses" that they "may sustain in any way (i) related to the failure of the Originator to perform its duties in compliance with the terms of this Agreement, (ii) arising from a breach by the Originator of its representations and warranties in Section 3.01 and 3.02 of this Agreement or (iii) related to the origination or prior servicing of the Mortgage Loans by reason of any acts, omissions, or alleged acts or omission of the Originator, the related Seller or any servicer." *Id.* at 26.

**134**

However, in a different portion of the contract, the same principle suggests that the indemnification provision excludes claims between the parties. Section 5.01(a) contains a concluding sentence that § 5.01(e) does not: "This indemnity agreement will be in addition to any liability which the Originator may otherwise have." Stern Decl. Ex. 2, at 23. The absence of such language in § 5.01(e) signals that the contracting parties did not intend for indemnification under § 5.01(e) to be in addition to any liability that the Originator otherwise might have, such as lawsuits to enforce Defendant's repurchase obligation. Because the same canon of contract construction forges conflicting conclusions, the parties' intention to provide indemnification for claims between the parties is hardly unmistakable, as required. *See Hooper,* 74 N.Y.2d at 492, 549 N.Y.S.2d 365, 548 N.E.2d 903.

Lastly, Plaintiff argues that courts have found that contracts with similar indemnification provisions to the ones at issue here unequivocally cover claims between contracting parties, citing *E\*TRADE Fin. Corp. v. Deutsche Bank AG,* 631 F.Supp.2d 313 (S.D.N.Y.2009), *aff'd,* 374 Fed.Appx. 119 (2d Cir.2010) as directly on point. In *E\*TRADE,* the court found that the contract unambiguously contemplated indemnification between the contracting parties because the remedy provision, § 9.01, could only be resolved within the framework of § 9.02, the indemnification provision. *Id.* at 391–92. Plaintiff argues that like § 9.01 in *E\*TRADE,* § 3.04 here unambiguously contemplates indemnification between contracting parties because the § 3.04 remedy may only be resolved within the framework of § 5.01, the indemnification provision. However, Plaintiff's truncated description of *E\*TRADE* omits the distinguishing feature of the case. In *E\*TRADE,* the plaintiff would have had no remedy for the defendant's breach of contract unless the court read the indemnification provision to cover first-party claims: "[The defendant's] reading of § 9.02 to apply only to indemnification claims for third-party actions, read together with the 'sole and exclusive remedy' clause of § 9.01, would require the absurd result that the parties to the [agreement] could not be held liable for breach of contract and indem-

nification would be limited only to third party claims." *E\*TRADE,* 631 F.Supp.2d at 392. Here, the Purchase Agreement provides Plaintiff with a separate "cure, repurchase and substitute" remedy under § 3.04. Stern Decl. Ex. 2, at 22. Thus, no absurd result manifests if the indemnification provision covers only third-party claims.

Because the Purchase Agreement is not "unmistakably clear" that the indemnification provision covers claims between the contracting parties, Defendant's motion to dismiss Plaintiff's third cause of action is GRANTED.

## CONCLUSION

For the reasons stated above, Defendant's motion to dismiss is GRANTED in part and DENIED in part.

SO ORDERED.